IN RE C.P.

[Cite as *In re C.P.,* **131 Ohio St.3d 513, 2012-Ohio-1446.**]

*Juveniles—Sex offenders—Eighth Amendment prohibition against cruel and unusual punishment—Due process—R.C. 2152.86—Automatic, lifelong registration and notification requirements of R.C. 2152.86 violate due process and prohibition against cruel and unusual punishment for juvenile sex offenders tried within juvenile system.*

(No. 2010-0731—Submitted February 16, 2011—Decided April 3, 2012.)

APPEAL from the Court of Appeals for Athens County,

No. 09CA41, 2010-Ohio-1484.

_____

SYLLABUS OF THE COURT

To the extent that it imposes automatic, lifelong registration and notification requirements on juvenile sex offenders tried within the juvenile system, R.C. 2152.86 violates the constitutional prohibition against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 9, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 16.

_____

PFEIFER, J.

{¶ 1} In this case, we determine the constitutionality of R.C. 2152.86, which creates a new class of juvenile sex-offender registrants: public-registry-qualified juvenile-offender registrants. These offenders are automatically subject to mandatory, lifetime sex-offender registration and notification requirements, including notification on the Internet. We hold that to the extent that it imposes

such requirements on juvenile offenders tried within the juvenile system, R.C. 2152.86 violates the constitutional prohibition against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 9, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 16.

Factual and Procedural Background

{¶ 2} On June 26, 2009, a multicount complaint was filed in Athens County Juvenile Court against appellant, C.P., who was 15 years old at the time. The complaint alleged that C.P. was a delinquent child and charged him with two counts of rape and one count of kidnapping with sexual motivation, each count a first-degree felony if committed by an adult. The victim was a six-year-old boy, a relative of C.P.

{¶ 3} The state immediately moved the juvenile court to transfer jurisdiction to the Athens County Court of Common Pleas, General Division. On July 29, 2009, the juvenile court held a hearing pursuant to R.C. 2152.12(B) to determine whether to retain jurisdiction over C.P.'s case. The parties stipulated that there was probable cause to believe that C.P. had committed the alleged offenses. The court learned that at age 11, C.P. had been adjudicated delinquent in Utah for sexually abusing his half-sister, who was two years younger than C.P., and that C.P. had undergone over two years of sex-offender treatment there as a result of his adjudication.

{¶ 4} At a hearing held on August 24, 2009, the court denied the state's motion to transfer jurisdiction over C.P. to the general division to be tried as an adult. The judge stated,

I think we can have our best chance of working with [C.P.]
in the juvenile system and I don't think everything has been

exhaustively tried there. It doesn't mean that there won't be consequences and it doesn't mean that there won't be loss of freedom there certainly will be if convicted of this offense [sic], but I think we have time within the juvenile system and we have resources within the juvenile system to work with this boy. So, I deny the state's motion for transfer and we'll continue to work with this within the juvenile system.

**{¶ 5}** In ruling against transfer, the judge cited the factors in R.C. 2152.12(E)(6) ("[t]he child is not emotionally, physically, or psychologically mature enough for the transfer") and (E)(7) ("[t]he child has a mental illness or is a mentally retarded person").

**{¶ 6}** C.P. thus remained under the jurisdiction of the juvenile court. The state sought to have C.P. sentenced as a serious youthful offender ("SYO") pursuant to R.C. 2152.13(A)(4)(b), and on September 14, 2009, the grand jury returned an indictment against him with an SYO specification attached to each of the three counts.

**{¶ 7}** On September 23, 2009, C.P. entered an admission to each charge in the indictment; because of the nature of his offenses, he was eligible for a discretionary SYO dispositional sentence pursuant to R.C. 2152.11(D)(2)(b). At a subsequent hearing, the court found C.P. to be a delinquent child and designated him an SYO in relation to each offense, imposing a three-year minimum commitment to the Ohio Department of Youth Services on each count, to run concurrently. As part of the SYO disposition, the court imposed three concurrent five-year prison terms, which were stayed pending C.P.'s successful completion of his juvenile dispositions.

**{¶ 8}** Further, the court advised C.P. of the duties and classification automatically imposed upon him by R.C. 2152.86. Pursuant to R.C.

2152.86(A)(1), the court classified C.P. a juvenile-offender registrant and informed him of his duty to abide by the registration and notification requirements of R.C. Chapter 2950. The court also classified C.P. a public-registry-qualified juvenile-offender registrant ("PRQJOR"). Pursuant to R.C. 2152.86(B)(1), C.P. was automatically classified as a Tier III sex-offender/child-victim offender. The judge further informed C.P. of his registration requirements:

> You are required to register in person with the sheriff of the county in which you establish residency within three days of coming into that county, or if temporarily domiciled for more than three days. If you change residence address you shall provide written notice of that residence change to the sheriff with whom you are most recently registered and to the sheriff in the county in which you intend to reside at least 20-days prior to any change of residence address. * * * You are required to provide to the sheriff temporary lodging information including address and length of stay if your absence will be for seven days or more. Since you are a public registry qualified juvenile offender registrant you are also required to register in person with the sheriff of the county in which you establish a place of education immediately upon coming to that county. * * * You are also required to register in person with the sheriff of the county in which you establish a place of employment if you have been employed for more than three days or for an aggregate of 14 days in a calendar year. * * * Employment includes voluntary services. As a public registry qualified juvenile offender registrant, you * * * also shall provide written notice of a change of address or your place of employment or your place of education at least 20 days prior to any change and

4

no later than three days after the change of employment. * * * [Y]ou shall provide written notice within three days of any change in vehicle information, e-mail addresses, internet identifiers or telephone numbers registered to or used by you to the sheriff with whom you are most recently registered.* * * [Y]ou are required to abide by all of the above described requirements * * * for your lifetime as a Tier III offender with in person verification every 90-days. That means for the rest of your life * * * every three months you're going to be checking in with [the] sheriff where you live or work or both. * * * Failure to register, failure to verify on the specific notice and times as outlined here will result in criminal prosecution.

{¶ 9} C.P. appealed his automatic classification as a Tier III juvenile-offender registrant and PRQJOR to the Fourth District Court of Appeals, arguing that R.C. 2152.86 violated his rights to due process and equal protection and his right against cruel and unusual punishment. The court of appeals affirmed the judgment of the trial court.

{¶ 10} The cause is before this court upon the acceptance of a discretionary appeal.

Law and Analysis

S.B. 10 as Punishment

{¶ 11} This court has recently held, in a case involving an adult offender, that the enhanced sex-offender reporting and notification requirements contained in R.C. Chapter 2950 enacted by Am.Sub.S.B. No. 10 ("S.B. 10") are punitive in nature, making their retroactive application unconstitutional: "Following the enactment of S.B. 10, all doubt has been removed: R.C. Chapter 2950 is punitive." *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d

1108, ¶ 16.  In this case we consider the constitutionality of the prospective, automatic application of those reporting and notification requirements to certain juvenile offenders.

R.C. 2152.86

**{¶ 12}** Pursuant to changes brought about by S.B. 10, R.C. 2152.86 creates a new class of juvenile sex-offender registrants: public-registry-qualified juvenile-offender registrants.  PRQJORs are subject to more stringent registration and notification requirements than other juvenile-offender registrants.  Moreover, the requirements are imposed automatically rather than at the discretion of a juvenile judge.

**{¶ 13}** Pursuant to R.C. 2152.86, PRQJOR status is assigned to juveniles who (1) were 14 through 17 years old when the offense was committed, (2) have been adjudicated a delinquent child for committing certain specified sexually oriented offenses, including rape, gross sexual imposition when the victim is under 12, sexual battery of a child under age 12, and aggravated murder, murder, or kidnapping with a purpose to gratify the sexual needs or desires of the offender, and (3) have had a court impose on them a serious youthful offender ("SYO") dispositional sentence under R.C. 2152.13.

Ohio's SYO Statutory Scheme

**{¶ 14}** As we explained in *State v. D.H.,* 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, the nature of an SYO disposition requires that the juvenile remain under the continuing jurisdiction of a juvenile judge:

> A juvenile charged as a potential serious youthful offender does not face bindover to an adult court; the case remains in the juvenile court.  Under R.C. 2152.11(A), a juvenile defendant who commits certain acts is eligible for "a more restrictive disposition."  That "more restricted disposition" is a "serious youthful offender"

disposition and includes what is known as a blended sentence—a traditional juvenile disposition coupled with the imposition of a stayed adult sentence. R.C. 2152.13. The adult sentence remains stayed unless the juvenile fails to successfully complete his or her traditional juvenile disposition. R.C. 2152.13(D)(2)(a)(iii). Theoretically, the threat of the imposition of an adult sentence encourages a juvenile's cooperation in his own rehabilitation, functioning as both carrot and stick.

*Id*. at ¶ 18.

{¶ 15} Only further bad acts by the juvenile as he is rehabilitated in the juvenile system can cause the stayed adult penalty to be invoked:

Any adult sentence that the trial court imposes through R.C. 2152.13(D)(2)(a)(i) is only a potential sentence—it is stayed pursuant to R.C. 2152.13(D)(2)(a)(iii) "pending the successful completion of the traditional juvenile dispositions imposed." R.C. 2152.13(D)(2)(a)(ii) requires the court to impose a juvenile disposition when it imposes an adult sentence; how the juvenile responds to that disposition will determine whether the stay is lifted on the adult sentence.

*Id.* at ¶ 30.

{¶ 16} R.C. 2152.86 changes the very nature of an SYO disposition, imposing an adult penalty immediately upon the adjudication. The juvenile is not given the opportunity to avoid the adult portion of his punishment by successfully completing his juvenile rehabilitation. Instead, he must comply with all of S.B.

10's reporting and notification requirements for Tier III sexual offenders contained in R.C. Chapter 2950.

Reporting and Notification Requirements for PRQJORs

{¶ 17} A PRQJOR must personally register with the sheriff within three days of coming into a county in which he resides or temporarily is domiciled for more than three days. R.C. 2950.04(A)(3)(a). He must also register with the sheriff of any county he enters to attend school or any county in which he is employed for more than three days. R.C. 2950.04(A)(3)(b)(i), (ii), and (iii). PRQJORs must personally verify that information with the sheriff every 90 days. R.C. 2950.06(B)(3) and (C)(1). Any time that information changes, the PRQJOR must notify the sheriff within three days. R.C. 2950.05(A).

{¶ 18} At the time of registration, PRQJORs must provide information such as license-plate numbers of vehicles available to them and e-mail addresses, Internet identifiers, and telephone numbers registered to or used by them. R.C. 2950.04(C)(6) and (10). Any changes in that information must be reported to the sheriff within three days. R.C. 2950.05(D).

{¶ 19} PRQJORs must comply with the community-notification requirements of R.C. 2950.11(A) and (B). As part of the notification requirements, local sheriffs disseminate the offender's picture and personal information to neighbors, local children services agencies, school officials, day-care centers, local universities, and volunteer organizations in contact with minors. R.C. 2950.11(A). The persons notified receive information regarding the youth's residence, place of employment, and school, as well as information about the adjudicated offense and a photograph. R.C. 2950.11(B). As a further requirement, PRQJORs must be included on the Ohio attorney general's electronic sex-offender registration and notification database ("eSORN"). R.C. 2950.13(A)(11).

Differences Between PRQJORs and

Other Juvenile-Offender Registrants

{¶ 20} Both the method of assignment and the obligations of PRQJORs assigned to Tier III differ from those juveniles placed in Tier III as juvenile-offender registrants ("JORs"). For juveniles who were adjudicated delinquent through a traditional juvenile disposition and who were age 14 or older at the time of their delinquent act, an assignment to Tier III is not automatic. Instead, if the juvenile court finds that the child is a JOR under R.C. 2152.82(A), the court holds a hearing to determine the JOR's tier classification. R.C. 2152.82(B). (Juveniles under 14 are not subject to registration requirements, regardless of the offense.) The determination which tier such an offender is placed in rests within the juvenile court's discretion. *Id.* If the court finds that the JOR is a Tier III sex-offender/child-victim offender, then the court may impose certain notification requirements contained in R.C. 2950.10 and 2950.11. R.C. 2152.82(B).

{¶ 21} Though all JORs must register personally with the sheriff within three days of entering into a county where they will reside or be temporarily domiciled, R.C. 2950.04(A)(3)(a), a PRQJOR must comply with additional registration requirements. PRQJORs must personally register with the sheriff of any county in which they attend school or in which they are employed for more than three days or for 14 or more days in a calendar year, regardless of whether the juvenile resides in or has a temporary domicile in that county. R.C. 2950.04(A)(3)(b). They must report within three days any change of vehicle information, e-mail addresses, Internet identifiers, and telephone numbers. R.C. 2950.05(D).

{¶ 22} Notification requirements also differ significantly. JORs assigned to Tier III are subject to community notification only if the juvenile court orders it, R.C. 2152.82(B), and to victim notification only if the victim requests it. R.C. 2950.10. The registration information of JORs is not disseminated on the

Internet. For PRQJORs, on the other hand, the community- and victim-notification requirements are automatic. R.C. 2950.11(F)(1)(a); 2950.10(B)(2). Further, the state must place PRQJORs on its public Internet database. R.C. 2950.13(A)(11).

{¶ 23} The potential for reclassification varies greatly between PRQJORs and JORs. For JORs, the juvenile court must conduct a hearing "upon completion of the disposition of that child" to determine whether the child should be reclassified. R.C. 2152.84(A)(1). Additionally, a JOR may file a petition for reclassification three years after the court issues its order pursuant to that mandatory hearing, a second petition three years later, and further petitions every five years thereafter. R.C. 2152.85(B). PRQJORs, in contrast, do not receive a reclassification hearing upon the completion of their juvenile disposition. Instead, they are placed on a reclassification track similar to that of adult Tier III offenders. They are not eligible for a reclassification hearing until 25 years after their statutory registration duties begin. R.C. 2950.15(C)(2) and 2152.85(G).

{¶ 24} In sum, for PRQJORs, Tier III classification imposes a lifetime penalty that extends well beyond the age at which the juvenile court loses jurisdiction. It is a consequence that attaches immediately and leaves a juvenile with no means of avoiding the penalty by demonstrating that he will benefit from rehabilitative opportunities.

Cruel and Unusual Punishment

Cruel and Unusual Punishment Under the United States Constitution

{¶ 25} The Eighth Amendment to the United States Constitution states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." That the Eighth Amendment prohibits torture is elemental. *Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L.Ed. 345 (1878). But the bulk of Eighth Amendment jurisprudence concerns not whether a particular punishment is barbaric, but whether it is disproportionate to the crime. Central to

the Constitution's prohibition against cruel and unusual punishment is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

{¶ 26} Proportionality review falls within two general classifications: the first involves "challenges to the length of term-of-years sentences given all the circumstances in a particular case." The second, which until recently was applied only in capital cases, involves "cases in which the Court implements the proportionality standard by certain categorical restrictions." *Graham v. Florida*, ___ U.S. ___, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825 (2010).

{¶ 27} In this case, we address the second classification of cases. Within that classification, there are two subsets, "one considering the nature of the offense, the other considering the characteristics of the offender." *Id*. at 2022. In regard to the nature of the offense, for instance, the court has held that capital punishment is impermissible for nonhomicide crimes against individuals. *Kennedy v. Louisiana*, 554 U.S. 407, 437, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008). In this juvenile case, we are dealing with the second subset, the characteristics of the offender.

{¶ 28} In recent years, the court has established categorical rules prohibiting certain punishments for juveniles. In *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the court prohibited the death penalty for defendants who committed their crimes before the age of 18. In *Graham*, the court held that the Eighth Amendment prohibits imposition of a life-without-parole sentence on a juvenile offender who did not commit homicide. It is important to note that in both *Roper* and *Graham*, the court addressed the cases of juveniles who had been tried as adults. Here, we address the imposition of a sentence upon a child who remains under the jurisdiction of the juvenile court.

**{¶ 29}** The court engages in a two-step process in adopting categorical rules in regard to punishment: first, the court considers whether there is a national consensus against the sentencing practice at issue, and second, the court determines "in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Graham*, ___ U.S. at ___, 130 S.Ct. at 2022, 176 L.Ed.2d 825.

National Consensus

**{¶ 30}** In 2006, Congress passed the Adam Walsh Child Protection and Safety Act ("Adam Walsh Act"), P.L. No. 109-248, 120 Stat. 587, codified at 42 U.S.C. 16901 et seq. Section 16912(a) of the Adam Walsh Act "directs every jurisdiction to maintain a sex-offender registry conforming to the requirements of the Act. And to ensure compliance, Congress directed that states that did not adopt the Adam Walsh Act risked losing ten percent of certain federal crime-control funds that would otherwise be allocated to them. Section 16925(a)." *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 19. These registry requirements are contained in the Sex Offender Registration and Notification Act ("SORNA"), Title I of the Adam Walsh Act.

**{¶ 31}** Ohio was the first state to implement SORNA. Id. at ¶ 20. By the start of 2011, only three other states were in substantial compliance with SORNA. http://www.ojp.usdoj.gov/newsroom/pressreleases/2011/SMART11054.htm. Then, on January 11, 2011, the United States attorney general issued Supplemental Guidelines for Sex Offender Registration and Notification, 76 Fed.Reg. 1630 ("Supplemental Guidelines"). These guidelines made significant changes to the National Guidelines for Sex Offender Registration and Notification issued on July 2, 2008. 73 Fed.Reg. 38030. The attorney general promulgated the Supplemental Guidelines in furtherance of his key role in the implementation of SORNA; SORNA "charges the Attorney General with responsibility for issuing guidelines and regulations to interpret and implement SORNA and for

12

determining whether jurisdictions have substantially implemented SORNA in their programs. See 42 U.S.C. 16912(b), 16925." 76 Fed.Reg. at 1631.

{¶ 32} In releasing the Supplemental Guidelines, the attorney general noted that one of the largest barriers to compliance by states was the fact that "SORNA includes as covered 'sex offender[s]' juveniles at least 14 years old who are adjudicated delinquent for particularly serious sex offenses." 76 Fed.Reg. at 1636. An April 2009 50-state survey on SORNA conducted by the National Consortium for Justice Information and Statistics stated that "[t]he most commonly cited barrier to SORNA compliance was the act's juvenile registration and reporting requirements, cited by 23 states." National Consortium for Justice Information and Statistics, Survey on State Compliance with the Sex Offender Registration and Notification Act (SORNA) (2009) 2. In 2008, the Council of State Governments promulgated a resolution against the application of SORNA to juveniles, stating that "[t]he Council of State Governments strongly opposes SORNA's application to juvenile sex offenders and urges Congress to revise the law to more accurately address the needs of juvenile offenders." http://www.csg.org/knowledgecenter/docs/CSG%20Resolution%20Opposing%20 SORNA%20Application%20to%20Juvenile%20Offenders.pdf.

{¶ 33} In January 2011, because of that resistance by the states, the attorney general exercised his authority under 42 U.S.C. 16918(c)(4) "to provide that jurisdictions need not publicly disclose information concerning persons required to register on the basis of juvenile delinquency adjudications." 76 Fed.Reg. at 1632.

{¶ 34} The change created a new discretionary exemption from public disclosure on the Internet. Moreover, the attorney general announced that jurisdictions are also no longer required to provide registration information to "certain school, public housing, social service, and volunteer entities, and other organizations, companies, or individuals who request notification. * * *

Accordingly, if a jurisdiction decides not to include information on a juvenile delinquent sex offender on its public Web site, as is allowed by these supplemental guidelines, information on the sex offender does not have to be disclosed to these entities." 76 Fed.Reg. at 1637.

{¶ 35} Thus, in response to the national foot-dragging on SORNA compliance, the attorney general completely lifted the requirement that juveniles be placed on eSORN and that certain entities be notified of their status: "[F]ollowing the issuance of these supplemental guidelines, there is no remaining requirement under SORNA that jurisdictions publicly disclose information about sex offenders whose predicate sex offense 'convictions' are juvenile delinquency adjudications." 76 Fed.Reg. at 1632.

{¶ 36} Thus, the attorney general acknowledged that to be SORNA compliant in January 2011 required less in the area of publication of a juvenile's status than it had previously:

> Given this change, the effect of the remaining registration requirements under SORNA for certain juvenile delinquent sex offenders is, in essence, to enable registration authorities to track such offenders following their release and to make information about them available to law enforcement agencies. * * * There is no remaining requirement under SORNA that jurisdictions engage in any form of public disclosure or notification regarding juvenile delinquent sex offenders. Jurisdictions are free to do so, but need not do so to any greater extent than they may wish.

76 Fed.Reg. at 1632.

{¶ 37} This declaration is a major shift in policy, reflective of a national consensus against the very policy that Ohio imposed as part of its attempt to

14

comply with SORNA. In short, outside of three other states, the rest of the nation dealt with an entirely different landscape vis-à-vis SORNA. The goalposts had been moved—after Ohio and other states had already instituted a system that the rest of the nation resisted. The assumption that a national consensus favored publication of juvenile sex offenders' personal information had collapsed. Even after the Supplemental Guidelines, as of December 2011, the United States Justice Department has reported that only 15 states are in substantial compliance with SORNA. National Conference of State Legislatures, Adam Walsh Child Protection and Safety Act Compliance News, http://www.ncsl.org/?tabid=12696 (updated Dec. 14, 2011); http://www.governing.com/blogs/fedwatch/States-Find-SORNA-Non-Compliance-Cheaper.html (Nov. 11, 2011).

Independent Review

{¶ 38} Although national consensus is an important factor in the determination of whether a punishment is cruel or unusual, this court must also conduct an independent review of the sentencing practice in question to determine whether it fits within the constraints of the Eighth Amendment. *Graham,* ___ U.S. at ___, 130 S.Ct. at 2026, 176 L.Ed.2d 825, citing *Roper*, 543 U.S. at 575, 125 S.Ct. 1183, 161 L.Ed.2d 1. "The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question, * * * [and] whether the challenged sentencing practice serves legitimate penological goals." *Graham* at 2026. We thus undertake our own independent review addressing these factors.

Culpability of Offenders

{¶ 39} In regard to the culpability of the offenders, we note that Ohio has developed a system for juveniles that assumes that children are not as culpable for their acts as adults. The court's decision in *Graham* supports this self-evident principle:

*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments. 543 U.S., at 569, 125 S.Ct. 1183. As compared to adults, juveniles have a " 'lack of maturity and an underdeveloped sense of responsibility' "; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." *Id.,* at 569-570, 125 S.Ct. 1183.  These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.,* at 573, 125 S.Ct. 1183. Accordingly, "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.,* at 569, 125 S.Ct. 1183. A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult." *Thompson* [*v. Oklahoma*, 487 U.S. 815] at 835, 108 S.Ct. 2687, [101 L.Ed.2d 702 (1988)] (plurality opinion).

*Graham*, ___ U.S. ___, 130 S.Ct. at 2026, 176 L.Ed.2d 825.

{¶ 40} Not only are juveniles less culpable than adults, their bad acts are less likely to reveal an unredeemable corruptness:

Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. *Roper*, 543 U.S., at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1.  It remains true that "[f]rom

16

> a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Ibid.*

*Graham* at 2026-2027.

{¶ 41} In this case we address a lifetime penalty—albeit open to review after 25 years—making the offender's potential for redemption particularly relevant. Juvenile offenders are more capable of change than adult offenders. And again, we are dealing in this case with juveniles who remain under the jurisdiction of the juvenile court. Based on the review of a juvenile judge, juveniles deemed serious youthful offenders have been determined to be amenable to the rehabilitative aims of the juvenile system. They are in a category of offenders that does not include the worst of those who commit crimes as juveniles.

Nature of the Offenses

{¶ 42} An important consideration in addressing culpability in an independent review of a punishment for Eighth Amendment purposes is the nature of the offenses to which the penalty may apply. In this case, R.C. 2152.86 applies to sex offenses, including rape. R.C. 2152.86(A)(1)(a). In *Graham*, the court stated that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Graham* at 2027. The court bluntly noted, "Although an offense like robbery or rape is 'a serious crime deserving serious punishment,' *Enmund* [*v. Florida*, 458 U.S. 782] at 797, 102 S.Ct. 3368, [73 L.Ed.2d 1140 (1982)], those crimes differ from homicide crimes in a moral sense." *Graham*,___ U.S. at ___, 130 S.Ct. at 2027, 176 L.Ed.2d 825.

{¶ 43} Thus, as the court pointed out in *Graham*, a juvenile who did not kill or intend to kill has "twice diminished moral culpability" on account of his

age and the nature of his crime. *Id.* Thus, when we address the constitutionality of the penalties resulting from an application of R.C. 2152.86, we first recognize that those punishments apply to juveniles with a reduced degree of moral culpability.

Severity of Punishment

{¶ 44} The next step in the Eighth Amendment analysis is a consideration of the punishment. In this case, as opposed to *Roper* and *Graham*, we are not dealing with the harshest and next-harshest possible sentences, death and life without possibility of parole. Indeed, in this case, if C.P.'s behavior does not warrant the imposition of the adult portion of his SYO sentence, he will not spend time in an adult prison cell. When his juvenile commitment is complete, he will no longer be confined. However, his punishment will continue. Registration and notification requirements for life, with the possibility of having them lifted only after 25 years, are especially harsh punishments for a juvenile. In *Graham*, the court wrote that a life sentence for a juvenile is different from such a sentence for an adult; the juvenile will spend a greater percentage of his life in jail than the adult. *Graham*, ___ U.S. ___, 130 S.Ct. at 2028, 176 L.Ed.2d 825.

{¶ 45} Here, too, the registration and notification requirements are different from such a penalty for adults. For juveniles, the length of the punishment is extraordinary, and it is imposed at an age at which the character of the offender is not yet fixed. Registration and notification necessarily involve stigmatization. For a juvenile offender, the stigma of the label of sex offender attaches at the start of his adult life and cannot be shaken. With no other offense is the juvenile's wrongdoing announced to the world. Before a juvenile can even begin his adult life, before he has a chance to live on his own, the world will know of his offense. He will never have a chance to establish a good character in the community. He will be hampered in his education, in his relationships, and in his work life. His potential will be squelched before it has a chance to show itself.

A juvenile—one who remains under the authority of the juvenile court and has thus been adjudged redeemable—who is subject to sex-offender notification will have his entire life evaluated through the prism of his juvenile adjudication. It will be a constant cloud, a once-every-three-month reminder to himself and the world that he cannot escape the mistakes of his youth. A youth released at 18 would have to wait until age 43 at the earliest to gain a fresh start. While not a harsh penalty to a career criminal used to serving time in a penitentiary, a lifetime or even 25-year requirement of community notification means everything to a juvenile. It will define his adult life before it has a chance to truly begin.

Penological Justifications

{¶ 46} Finally, in an Eighth Amendment analysis, we must consider the penological justifications for the sentencing practice. *Graham*, ___ U.S. at ___, 130 S.Ct. at 2028, 176 L.Ed.2d 825. Since we are deciding a case involving a juvenile who has not been bound over to adult court, the goals of juvenile disposition are relevant to our analysis. R.C. 2152.01 establishes the purposes of any juvenile disposition:

(A) The overriding purposes for dispositions under this chapter are to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender. These purposes shall be achieved by a system of graduated sanctions and services.

{¶ 47} Lifetime registration and notification requirements run contrary to R.C. 2152.01's goals of rehabilitating the offender and aiding his mental and physical development. Instead, lifetime registration and notification ensure that

PRQJORs will encounter continued difficulties, because of their offenses, long into adulthood. Notification and registration anchor the juvenile offender to his crime.

{¶ 48} As for protecting the public interest and safety, some might argue that the registration and notification requirements further those aims. However, it is difficult to say how much the public interest and safety are served in individual cases, because the PRQJOR statutory scheme gives the juvenile judge no role in determining how dangerous a child offender might be or what level of registration or notification would be adequate to preserve the safety of the public.

{¶ 49} The PRQJOR penalties do meet the statutory objective of accountability. However, a major issue in this case is whether the depth and duration of the accountability that R.C. 2152.86 requires of a juvenile offender are excessive. Another statutory goal, restoring the victim, is advanced only minimally by the requirements of R.C. 2152.86.

{¶ 50} In addition to the penological considerations laid out by Ohio's legislature, *Graham* set forth "the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation" and considered whether any of those goals justified a sentence of life without parole for juveniles committing nonhomicide crimes. *Id*., ___ U.S. at ___, 130 S.Ct. at 2028, 176 L.Ed.2d 825.

{¶ 51} The court held that retribution could not support the sentence in that case, because " '[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender,' *Tison* [*v. Arizona*, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)]," and because " '[w]hether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult.' [*Roper*,] 543 U.S., at 571, 125 S.Ct. 1183 [161 L.Ed.2d 1]." *Graham* at 2028. As

the court recognized in *Graham*, retribution does not justify imposing the same serious penalty on a less culpable defendant.

{¶ 52} The court in *Graham* also discounted the penological goal of deterrence for the same reason we do in this case:

> Because juveniles' "lack of maturity and underdeveloped sense of responsibility * * * often result in impetuous and ill-considered actions and decisions," *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), they are less likely to take a possible punishment into consideration when making decisions.

*Graham*, ___ U.S. at ___, 130 S.Ct. at 2028-2029, 176 L.Ed.2d 825. Further, in this case, the significance of the particular punishment and its effects are less likely to be understood by the juvenile than the threat of time in a jail cell. Juveniles are less likely to appreciate the concept of loss of future reputation.

{¶ 53} Incapacitation as a penological goal is not relevant in this case. The focus here is what happens to a juvenile once he emerges from confinement.

{¶ 54} Finally, as to the final penological goal—rehabilitation—we have already discussed the effect of forcing a juvenile to wear a statutorily imposed scarlet letter as he embarks on his adult life. "Community notification may particularly hamper the rehabilitation of juvenile offenders because the public stigma and rejection they suffer will prevent them from developing normal social and interpersonal skills—the lack of those traits [has] been found to contribute to future sexual offenses." Michele L. Earl-Hubbard, *The Child Sex Offender Registration Laws: The Punishment, Liberty Deprivation, and Unintended Results Associated with the Scarlet Letter Laws of the 1990s*, 90 Nw.U.L.Rev. 788, 855-856 (1996).

**{¶ 55}** In addition to increasing the likelihood of reoffense, publication of a juvenile's offense makes reintegration into society more difficult, due in part to the personal economic impact:

> Sex offender registration constitutes an additional form of punishment for juvenile sex offenders, perhaps more substantial than that experienced by adult sex offenders. Many juvenile sex offenders are released back into society after completion of their court-imposed disposition at an age when they would ordinarily first be entering the workforce and find themselves unable to obtain employment due to their publicized "sex offender" label. Any job in education, health care, or the military is virtually impossible to get.

Phoebe Geer, *Justice Served? The High Cost of Juvenile Sex Offender Registration*, 27 Developments in Mental Health Law 33, 48-49 (2008). Any job that requires a background check is placed virtually out of reach. *Id.* And although a PRQJOR's employer's name is not made public under R.C. 2950.11(B)(2), the employer's address is. That fact can only harm a juvenile offender's employment prospects.

**{¶ 56}** The social response to publication of a juvenile's sexual offenses also affects rehabilitation:

> When a sex offender registration and notification law requires door-to-door neighborhood notification, public announcements, or listing on a sex offender website, the likelihood that a juvenile offender's peers and community will discover the offense is very high. Public disclosure may inspire "vigilantism,

22

public shame, social ostracism, and various types of adverse legal action, including loss of employment and eviction."

*Id.* at 47, quoting Stacey Hiller, *The Problem with Juvenile Sex Offender Registration: The Detrimental Effects of Public Disclosure,* 7 B.U.Pub.Int.L.J. 271, 287 (1998).

**{¶ 57}** We conclude that the social and economic effects of automatic, lifetime registration and notification, coupled with an increased chance of reoffense, do violence to the rehabilitative goals of the juvenile court process. As the court decided in *Graham* in regard to a life sentence without parole for juvenile offenders, we find that penological theory "is not adequate to justify" the imposition of the lifetime registration and notification requirements of R.C. 2152.86 for juveniles. *Graham*, ___ U.S. at ___, 130 S.Ct. at 2030, 176 L.Ed.2d 825.

*Graham* Factors

**{¶ 58}** In sum, the limited culpability of juvenile nonhomicide offenders who remain within the jurisdiction of the juvenile court, the severity of lifetime registration and notification requirements of PRQJOR status, and the inadequacy of penological theory to justify the punishment all lead to the conclusion that the lifetime registration and notification requirements in R.C. 2152.86 are cruel and unusual. We thus hold that for a juvenile offender who remains under the jurisdiction of the juvenile court, the Eighth Amendment forbids the automatic imposition of lifetime sex-offender registration and notification requirements.

Cruel and Unusual Punishment Under Ohio Law

**{¶ 59}** The Ohio Constitution, Article I, Section 9, contains its own prohibition against cruel and unusual punishment. It provides unique protection for Ohioans:

23

> The Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups.

*Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph one of the syllabus. Thus, the Ohio Constitution, Article I, Section 9, provides protection independent of the protection provided by the Eighth Amendment.

{¶ 60} In its own jurisprudence regarding Article I, Section 9, this court has recognized that cases involving cruel and unusual punishments are rare, "limited to those involving sanctions which under the circumstances would be considered shocking to any reasonable person." *McDougle v. Maxwell*, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964). Lack of proportionality is a key factor: "A punishment does not violate the constitutional prohibition against cruel and unusual punishments, if it be not so greatly disproportionate to the offense as to shock the sense of justice of the community." *State v. Chaffin,* 30 Ohio St.2d 13, 282 N.E.2d 46 (1972), paragraph three of the syllabus.

{¶ 61} For juveniles who remain in the juvenile system, R.C. 2152.86 is striking in the disproportionate way it treats PRQJORs. In *In re Agler*, 19 Ohio St.2d 70, 72, 249 N.E.2d 808 (1969), this court stated that "the decided emphasis [of juvenile courts] should be upon individual, corrective treatment." We trust judges to make the important calls in imposing the adult portion of the SYO sentence. In discretionary SYO cases, juvenile judges determine whether an SYO denomination is appropriate. But under R.C. 2152.86, the juvenile judge is given

absolutely no discretion over the portion of the juvenile's penalty that could extend for a lifetime. There is none of the important, individualized work that juvenile judges do. Instead, a lifetime punishment is imposed with no chance for reconsideration of its appropriateness for 25 years. Compared to punishments for other juvenile offenders, whose cases are reevaluated when their juvenile disposition ends and at regularly scheduled intervals thereafter, this punishment is disproportionate.

{¶ 62} Lack of proportionality is also evidenced by the very public nature of the penalty. The punishment of lifetime exposure for a wrong committed in childhood runs counter to the private nature of our juvenile court system. Confidentiality has always been at the heart of the juvenile justice system. That core principle is trampled by any requirement of public notification. Timothy E. Wind, *The Quandary of Megan's Law: When the Sex Offender is a Child*, 37 J.Marshall L.Rev. 73, 117 (2003). Publicity is even more of a concern for PRQJORs, whose information is disseminated on the Internet.

{¶ 63} Ohio's juvenile system is designed to shield children from stigmatization based upon the bad acts of their youth:

> For delinquent children, "it is the law's policy 'to hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past.' " *In re Gault* (1967), 387 U.S. 1, 24, 87 S.Ct. 1428, 1442, 18 L.Ed.2d 527, 544. In Ohio, we are required to liberally interpret the juvenile delinquency provisions to "protect the public interest in removing the consequences of criminal behavior and the taint of criminality from children committing delinquent acts and to substitute therefor a program of supervision, care, and rehabilitation." See R.C. 2151.01(B).

*State ex rel. Plain Dealer Publishing Co. v. Geauga Cty. Court of Common Pleas, Juvenile Div.*, 90 Ohio St.3d 79, 83, 734 N.E.2d 1214 (2000).

{¶ 64} "[T]raditionally juveniles have been shielded from the stigma of the proceedings by keeping hearings private and not publishing juveniles' names. See Champion & Mays, Transferring Juveniles to Criminal Courts: Trends and Implications for Criminal Justice (1991) 38." *State v. Hanning*, 89 Ohio St.3d 86, 89, 728 N.E.2d 1059 (2000).

{¶ 65} In this case, for instance, we refer to the juvenile by his initials, rather than by his full name. But if R.C. 2152.86 is enforced, his name, offense, and addresses will be published on the Internet.

{¶ 66} The Ohio Juvenile Rules also are designed to keep juvenile dispositions private. Juv.R. 37(B) states, "No public use shall be made by any person, including a party, of any juvenile court record * * *, except in the course of an appeal or as authorized by order of the court or by statute." This court wrote in *State ex rel. Scripps Howard Broadcasting Co. v. Cuyahoga Cty. Court of Common Pleas, Juvenile Div.*, 73 Ohio St.3d 19, 22, 652 N.E.2d 179 (1995), that "[t]he purpose of Juv.R. 37(B) is to keep confidential juvenile court records involving children, since their welfare is at stake."

{¶ 67} Registration and notification requirements frustrate two of the fundamental elements of juvenile rehabilitation: confidentiality and the avoidance of stigma. Confidentiality promotes rehabilitation by allowing the juvenile to move into adulthood without the baggage of youthful mistakes. Public exposure of those mistakes brands the juvenile as an undesirable wherever he goes. *See* Wind, 37 J.Marshall L.Rev. at 117.

{¶ 68} The publication required by S.B. 10 causes the greatest possible stigmatization:

Operating directly contrary to the rehabilitative goals of the juvenile justice system, sex offender registration and notification laws can publicly and permanently mark juvenile sex offenders as deviant criminals who should be feared and shunned. While many juvenile proceedings are confidential and sealed, sex offender registration and notification laws, by creating a public record, place the sexual offense of a juvenile directly and prominently in the public eye.

[F]ew labels are as damaging in today's society as "convicted sex offender." Sex offenders are, as one scholar put it, "the lepers of the criminal justice system," with juveniles listed in the sex offender registry sharing this characterization. The state's interest in and responsibility for a juvenile's well-being and rehabilitation is not promoted by a practice that makes a juvenile's sex offenses public.

(Footnotes omitted.) Geer, *Justice Served?*, 27 Developments in Mental Health Law at 47, quoting Robert E. Shepherd, *Advocating for the Juvenile Sex Offender, Part 2* (2007), 21 Crim.Just. 52, 53.

{¶ 69} S.B. 10 forces registration and notification requirements into a juvenile system where rehabilitation is paramount, confidentiality is elemental, and individualized treatment from judges is essential. The public punishments required by R.C. 2152.86 are automatic, lifelong, and contrary to the rehabilitative goals of the juvenile system. We conclude that they "shock the sense of justice of the community" and thus violate Ohio's prohibition against cruel and unusual punishments.

Due Process

**{¶ 70}** Appellant also argues that R.C. 2152.86 violates a juvenile's right to due process guaranteed by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 16. We agree.

**{¶ 71}** "Constitutional procedural safeguards in the juvenile context find their genesis in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. " *D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 44. Due process standards as they relate to juvenile proceedings are inexact; this court has held that "fundamental fairness is the overarching concern." *Id.* at ¶ 51.

**{¶ 72}** From a due process perspective, both this court and the United States Supreme Court have held that juveniles may be treated differently from adults.

> [O]ur acceptance of juvenile courts distinct from the adult criminal justice system assumes that juvenile offenders constitutionally may be treated differently from adults. * * * Viewed together, our cases show that although children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability and their needs for "concern, * * *, sympathy, and * * * paternal attention." [*McKeiver v. Pennsylvania*, 403 U.S. 528, 550, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971)] (plurality opinion).

*Bellotti v. Baird*, 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). The United States Supreme Court has stated that "the applicable due process standard in juvenile proceedings * * * is fundamental fairness." *McKeiver* at 543.

**{¶ 73}** In *D.H.*, this court applied a fundamental-fairness standard in addressing due process concerns, holding that a balanced approach is required to preserve the special nature of the juvenile process. We recognized the state's stake in the rehabilitation of juvenile offenders and the state's paternal role:

> The State has "a parens patriae interest in preserving and promoting the welfare of the child," *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982), which makes a juvenile proceeding fundamentally different from an adult criminal trial. We have tried, therefore, to strike a balance—to respect the "informality" and "flexibility" that characterize juvenile proceedings, *In re Winship* [397 U.S. 358, 366, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)], and yet to ensure that such proceedings comport with the "fundamental fairness" demanded by the Due Process Clause. *Breed v. Jones* [421 U.S. 519, 531, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975)]; *McKeiver*, supra, 403 U.S., at 543, 91 S.Ct., at 1985, [29 L.Ed.2d 647] (plurality opinion).

*D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 50, quoting *Schall v. Martin*, 467 U.S. 253, 263, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984).

**{¶ 74}** In *D.H.*, we addressed whether fundamental fairness requires a jury to participate in the imposition of the adult portion of a sentence in an SYO case tried to a jury. The court had previously held in a case involving sentences for adult offenders, *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, that statutes violate the Sixth Amendment right to trial by jury if they require judicial fact-finding before imposition of consecutive sentences, sentence enhancements, or sentences greater than the maximum term authorized by a jury verdict or admission of the defendant. In *Foster*, the statutes at issue required the

trial judge, not a jury, to make factual determinations before imposing consecutive sentences and sentence enhancements; in *D.H.*, the SYO statute required the juvenile judge to make factual determinations before imposing the adult portion of the SYO sentence.

{¶ 75} In *D.H.*, we held that fundamental fairness does not demand the same Sixth Amendment jury-trial rights for juveniles as required by *Foster* for adults. This court based its decision on the special role of juvenile courts and juvenile judges.

> The court's dispositional role is at the heart of the remaining differences between juvenile and adult courts. It is there that the expertise of a juvenile judge is necessary. The judge, given the factors set forth in R.C. 2152.13(D)(2)(a)(i), must assess the strengths and weaknesses of the juvenile system vis-à-vis a particular child to determine how this particular juvenile fits within the system and whether the system is equipped to deal with the child successfully. That assessment requires as much familiarity with the juvenile justice system as it does familiarity with the facts of the case. To leave that determination to an expert, given the juvenile system's goal of rehabilitation, does not offend fundamental fairness, especially since the adult portion of the blended sentence that the judge imposes upon a jury verdict is not immediately, and may never be, enforced.

*Id.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 59.

{¶ 76} Thus, this court held that the discretionary role of the judge in the disposition of a juvenile case overrides the importance of the role of the jury. The disposition of a child is so different from the sentencing of an adult that

fundamental fairness to the child demands the unique expertise of a juvenile judge. *Id.*

{¶ 77} R.C. 2152.86 eliminates the discretion of the juvenile judge, this essential element of the juvenile process, at the most consequential part of the dispositional process. R.C. 2152.86 requires the automatic imposition of a lifetime punishment—with no chance of reconsideration for 25 years—without benefit of a juvenile judge weighing its appropriateness. An automatic longterm punishment is contrary to the juvenile system's core emphasis on individual, corrective treatment and rehabilitation. As we held in *In re Caldwell*, 76 Ohio St.3d 156, 157, 666 N.E.2d 1367 (1996),

> [t]he legislative purpose regarding [juveniles] has been laid out in R.C. 2151.01: to provide for the care, protection, and mental and physical development of children, to protect the public from the wrongful acts committed by juvenile delinquents, and to rehabilitate errant children and bring them back to productive citizenship, or, as the statute states, to supervise, care for and rehabilitate those children. Punishment is not the goal of the juvenile system, except as necessary to direct the child toward the goal of rehabilitation.

{¶ 78} R.C. 2152.86(B)(1) requires the imposition of an adult penalty for juvenile acts without input from a juvenile judge. Under R.C. 2152.86, the court cannot consider individual factors about a child or his background, cannot have a say in how often a child must register or where he must register, or determine how publication of the offense might affect rehabilitation. An SYO offender remains within the jurisdiction of the juvenile court, but R.C. 2152.86 removes the juvenile court's ability to exercise its most important role in rehabilitation.

Fundamental fairness requires that the judge decide the appropriateness of any such penalty.

{¶ 79} R.C. 2152.86's automatic imposition of an adult punishment—lifetime reporting and notification—stands in contrast to the R.C. 2152.14 process for invoking the adult portion of the sentence in an SYO disposition. R.C. 2152.14 installs procedural protections for juveniles before the adult portion of their disposition can be invoked. For instance, the juvenile must commit a *further* bad act while in custody before the invocation process can begin. A request must be filed showing that there is reasonable cause to believe that the "person committed an act that is a violation of the rules of the institution and that could be charged as any felony or as a first degree misdemeanor offense of violence if committed by an adult" or that the person "has engaged in conduct that creates a substantial risk to the safety or security of the institution, the community, or the victim." R.C. 2152.14(A)(2)(a) and (b).

{¶ 80} Once the request is filed, the adult portion of the sentence cannot be invoked without a public hearing. R.C. 2152.14(D). The juvenile has a right to counsel that may not be waived and the right to present evidence on his own behalf, "including evidence that [he] has a mental illness or is a mentally retarded person." *Id*. If the person submits evidence that he has a mental illness or is mentally retarded, the court must consider that evidence in determining whether to invoke the adult portion of the SYO dispositional sentence.

{¶ 81} Further, pursuant to R.C. 2152.14(E)(1), the court must find by clear and convincing evidence not only that the person serving the juvenile portion of an SYO dispositional sentence engaged in the conduct—the additional bad act—he is accused of, but also that the conduct "demonstrates that [he] is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction." And under R.C. 2152.14(E)(2), the juvenile court has the discretion to "modify

32

the adult sentence the court invokes to consist of any lesser prison term that could be imposed for the offense."

{¶ 82} Thus, for the bulk of Ohio's SYO scheme, the juvenile court retains discretion to deal individually with juvenile offenders, and procedural protections are in place before adult punishment can be invoked. Even after additional bad acts by a juvenile, the judge has the discretion not to invoke the adult sentence, or to lessen the one imposed at the time of the juvenile disposition. On the other hand, even for a juvenile who is amenable to rehabilitation and commits no further bad acts during his juvenile disposition, the adult consequences of registration and notification attach immediately. PRQJORs have no right to present evidence or even be heard on the issue of their classification.

{¶ 83} Once the juvenile court makes its SYO determination, the juvenile judge never gets an opportunity to determine whether the juvenile offender has responded to rehabilitation or whether he remains a threat to society. Even if the adult portion of his sentence is not invoked, the sex-offender classification is irrevocable. The timing of the classification—immediately upon the imposition of SYO status—leaves no room for the judge to determine whether the juvenile offender has been rehabilitated. And the automatically imposed punishment lasts far longer than the jurisdiction of the juvenile court.

{¶ 84} Again, we are dealing with juveniles who remain in the juvenile system through the decision of a juvenile judge—a decision made through the balancing of the factors set forth in R.C. 2152.12(B)—that the juvenile at issue is amenable to the rehabilitative purpose of the juvenile system. The protections and rehabilitative aims of the juvenile process must remain paramount; we must recognize that juvenile offenders are less culpable and more amenable to reform than adult offenders.

{¶ 85} The requirement in R.C. 2152.86 of automatic imposition of Tier III classification on a juvenile offender who receives an SYO dispositional

sentence undercuts the rehabilitative purpose of Ohio's juvenile system and eliminates the important role of the juvenile court's discretion in the disposition of juvenile offenders and thus fails to meet the due process requirement of fundamental fairness. In *D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 59, we held that because of the central role of the juvenile judge in a juvenile's rehabilitative process, fundamental fairness did not require the same jury-trial rights for juveniles as we required for adults in *Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. In this case, we determine that fundamental fairness is not a one-way street that allows only for an easing of due process requirements for juveniles; instead, fundamental fairness may require, as it does in this case, additional procedural safeguards for juveniles in order to meet of the juvenile system's goals of rehabilitation and reintegration into society.

## Conclusion

**{¶ 86}** R.C. 2152.86 creates a classification of juvenile offenders called public-registry-qualified juvenile-offender registrants. R.C. 2152.86 imposes upon that classification of juvenile offenders an automatic, lifetime requirement of sex-offender registration and notification, including placement on a public Internet registry. Such requirements are imposed upon juveniles without the participation of a juvenile judge. We conclude that R.C. 2152.86 is unconstitutional because the penalty it imposes violates the prohibitions against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 9. Further, we hold that R.C. 2152.86 is unconstitutional because the procedure involved in imposing the punishments violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 16.

{¶ 87} Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings in accordance with this opinion.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and LUNDBERG STRATTON, LANZINGER, and MCGEE BROWN, JJ., concur.

O'DONNELL and CUPP, JJ., dissent.

_____

**O'DONNELL, J., dissenting.**

{¶ 88} Respectfully, I dissent.

{¶ 89} In *State v. William*s, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, I expressed my view in a dissenting opinion, that consistent with prior holdings of this court, the registration and notification requirements of S.B. 10 are civil in nature and part of a regulatory scheme designed to protect the public from known sex offenders. *Id.* at ¶ 24-61. Because application of those requirements to juveniles pursuant to R.C. 2152.86 does not alter S.B. 10's nonpunitive purpose, that view also applies to juveniles such as C.P.

### Factual and Procedural Background

{¶ 90} In 2005, the state of Utah filed a petition charging C.P., then age 11, with destruction of property, sodomy, aggravated sexual abuse of a child, and rape of a child. The three latter charges stemmed from allegations that when C.P. was nine and ten years old, he had engaged in sexual conduct with his half-sister—three years younger—for several years. That conduct included making his sister perform strip acts, forcing her to perform and receive oral sex, exposing himself, and forcibly raping her. C.P. admitted to the charges of destruction of property, sodomy, and sexual abuse of a child, a charge which the state had reduced from aggravated sexual abuse of a child. The Utah juvenile court placed

C.P. in the temporary custody of the Division of Child and Family Services for foster care, committed him to the Department of Juvenile Justice Services for 30 days, and ordered him to obtain sex-specific counseling. During a neuropsychological evaluation conducted in 2006, C.P. admitted the allegations involving his half-sister and also admitted to having "touched five or six other young girls inappropriately."

{¶ 91} While in foster care in Utah, C.P. left his second foster home after being accused of touching a girl's breast at school. He was then placed in the Youth Track residential program for juvenile sex offenders, where he received inpatient residential care from June 1, 2006, through November 3, 2008, when he returned home to live with his mother. C.P. participated in outpatient counseling, but discontinued taking his medications because he did not like how they made him feel.

{¶ 92} Thereafter, C.P.'s parents agreed that he might benefit from living with his father in Ohio, and in June 2009, he moved to Ohio. Within nine days of his arrival, C.P., then age 15, secluded himself with his six-year-old nephew and orally and anally raped him.

{¶ 93} The day after the incident, the state filed a complaint against C.P. in the Athens County Juvenile Court, charging him with two counts of child rape and one count of kidnapping with sexual motivation, each count a first-degree felony if committed by an adult. The state filed a motion pursuant to R.C. 2152.10(A)(1)(b), which sought to transfer jurisdiction of the case to the common pleas court to prosecute C.P. as an adult. After holding an amenability hearing, the trial court denied the state's motion. The state then obtained an indictment against C.P. that contained a serious-youth-offender ("SYO") specification for each count.

{¶ 94} C.P. subsequently entered an admission to each charge in the indictment, and due to his age and the nature of his offenses, he was eligible for a

discretionary SYO dispositional sentence pursuant to R.C. 2152.11(D)(2)(b). The court found him to be a delinquent child and designated him an SYO in relation to each offense. It committed C.P. to the Ohio Department of Youth Services for concurrent commitments on each count of a minimum period of three years and a maximum period not to exceed age 21. As part of the SYO disposition, the court imposed three concurrent five-year prison terms that were stayed pending C.P.'s successful completion of his juvenile dispositions. The court further classified C.P. as a public-registry-qualified juvenile-offender registrant ("PRQJOR") pursuant to R.C. 2152.86(A)(1) and a Tier III sex-offender/child-victim offender pursuant to R.C. 2152.86(A)(1), and advised him of the duties imposed by that statute.

{¶ 95} C.P. appealed his classification as a Tier III offender and PRQJOR to the Fourth District Court of Appeals, arguing that R.C. 2152.86 violated his rights to due process and equal protection, as well as his right against cruel and unusual punishment. The court of appeals affirmed the judgment of the trial court.

### The Majority Opinion

{¶ 96} The majority reverses the judgment of the court of appeals, finding that the registration and notification requirements of R.C. 2152.86 constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 9. The majority further finds that because the statute imposes those requirements automatically rather than at the discretion of a juvenile judge, it also violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 16.

{¶ 97} The Ohio General Assembly passed 2007 Am.Sub.S.B. No. 10 ("S.B. 10") in accordance with legislation enacted by the United States Congress in an effort to create a national, uniform system of sex-offender registration.

*Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, ¶ 25. Amended by S.B. 10, R.C. 2950.02(B) declares the intent of the General Assembly "to protect the safety and general welfare of the people of this state" in providing for the registration and community notification of certain sex offenders, and it specifically included public-registry-qualified juvenile-offender registrants, such as C.P., among them. *Id.* It is undisputed that the General Assembly is " 'the ultimate arbiter of public policy' " and the only branch of government charged with fulfilling that role. *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 21, quoting *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Information Network v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21. And prior to this court's abandonment of precedent in the majority opinion in *Williams*, we have historically construed registration statutes as part of a civil regulatory scheme and nonpunitive in nature.

{¶ 98} Accordingly, in my view, the General Assembly constitutionally enacted R.C. 2152.86 and imposed registration and notification requirements on certain juvenile sex offenders based on concerns for public safety and public welfare. Those requirements are not punitive and do not offend the Constitution. To the extent that any policy concern exists regarding the registration of juvenile sex offenders, it is within the sole province of the legislature to address that issue.

### R.C. 2152.86 is not Punitive

{¶ 99} In *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.,* 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20, 73, this court reiterated that the constitutionality of a statute starts with a presumption of constitutionality based in part upon this court's deference to the legislative branch on matters of public policy. The strong presumption of constitutionality is further supported by the requirement that before we can declare a statute unconstitutional, it must appear beyond a reasonable doubt that the legislation and constitutional

provisions are clearly incompatible. *State v. Carswell*, 114 Ohio St.3d 210, 2007-Ohio-3723, 871 N.E.2d 547, ¶ 7. With respect to determining whether a registration statute is punitive, " 'only the clearest proof could suffice' " to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty. *United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), quoting *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

**{¶ 100}** The majority opinion begins with the premise that R.C. Chapter 2950 is punitive, and then it applies the two-part analysis discussed by the Supreme Court in *Graham v. Florida*, ___ U.S. ___, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825 (2010). *Graham* held that a juvenile offender's sentence of life imprisonment without the possibility of parole for convictions of non-homicide crimes violated the Eighth Amendment to the United States Constitution. The majority opinion today relies on *Graham* to conclude that the registration and notification requirements of R.C. 2152.86 constitute cruel and unusual punishment.

**{¶ 101}** The majority bases its conclusion on several factors: the lack of a national consensus favoring the publication of juvenile sex offenders' personal information, its belief that juvenile sex offenders are less culpable and more capable of change than adult sex offenders, and its position that the requirements of the statute are especially harsh because a juvenile offender will begin adulthood with the stigma associated with being labeled a sex offender, which in turn will hamper education, relationships, and employment opportunities. The majority further finds that R.C. 2152.86 does not advance penological goals. Under the guise of exercising the independent judgment permitted by the test in *Graham*, the majority impermissibly supplants the judgment of the General Assembly with its own beliefs.

**{¶ 102}** Registration has historically been viewed as a regulatory measure and not as a form of punishment. *See, e.g., R.W. v. Sanders*, 168 S.W.3d 65, 69 (Mo.2005), citing *Lambert v. California*, 355 U.S. 225, 229, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); *In re Richard A.*, 946 A.2d 204, 213 (R.I.2008) (sex-offender registration requirement for juveniles did not constitute punishment and was found constitutional). In *Smith v. Doe*, the court rejected analogies between sex-offender registration and "shaming punishments of the colonial period." 538 U.S. 84, 97, 123 S.Ct. 1140, 155 L.E.2d 164 (2003). "Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment." *Id.* at 98.

**{¶ 103}** As applied to juveniles, courts have rejected the argument that statutes subjecting juveniles to public registration are punitive because of the unpleasant consequences that may flow from registration or the length of time a juvenile may be required to report. In *United States v. Juvenile Male*, the Ninth Circuit Court of Appeals recently rejected the conclusion reached here by the majority, determining that the registration and notification requirements imposed by the federal Sex Offender Registration and Notification Act ("SORNA") on juveniles do not constitute cruel and unusual punishment. 670 F.3d 999, 1010-1011 (2012). After noting that "[t]he bar for cruel and unusual punishment is high," the court went on to explain:

> Although defendants understandably note that SORNA may have the effect of exposing juvenile defendants and their families to potential shame and humiliation for acts committed while still an adolescent, the statute does not meet the high standard of cruel and unusual punishment. The requirement that juveniles register in a sex offender database for at least 25 years because they committed the equivalent of aggravated sexual abuse

is not a disproportionate punishment. These juveniles do not face any risk of incarceration or threat of physical harm. In fact, at least two other circuits have held that SORNA's registration requirement is not even a punitive measure, let alone cruel and unusual punishment. *See United States v. May*, 535 F.3d 912, 920 (8th Cir.2008) ("SORNA's registration requirement demonstrates no congressional intent to punish sex offenders"); *see also United States v. Young*, 585 F.3d 199, 204-05 (5th Cir.2009).

*Id.*

**{¶ 104}** In the case of *In re Ronnie A.*, the Supreme Court of South Carolina reiterated its prior holding that "sex offender registration, regardless of the length of time, is non-punitive" and saw no reason to distinguish juvenile sex offenders. 355 S.C. 407, 409, 585 S.E.2d 311 (2003). Although the juvenile at issue did not have to be placed on the public registry because he was under 12 years of age at the time of his adjudication, the statute being challenged, S.C. Code Ann. 23-3-490, required public registration for offenders older than 12 for certain offenses.

**{¶ 105}** Additionally, although the Supreme Court of South Dakota struck down that state's public-registration statute on equal protection grounds, it reiterated its position that public registration is not punitive. *See In re Z.B.*, 2008 S.D. 108, 757 N.W.2d 595, ¶ 24. "Such measures are not penal; they are regulatory." *Id.* South Dakota amended its sex-offender registration statute in 2010, and the current version still requires juveniles over the age of 14 to publicly register as sex offenders for certain offenses. S.D. Codified Laws 22-24B-2.

**{¶ 106}** Although the majority finds juvenile sex offenders less culpable than their adult counterparts, juveniles commit more than 25 percent of all sex offenses and more than 35 percent of all sex offenses against children. Finkelhor,

Ormrod & Chaffin, *Juveniles Who Commit Sex Offenses Against Minors*, Office of Juvenile Justice and Delinquency Preventions, Juvenile Justice Bulletin 3 (Dec.2009). In fact, C.P. was a repeat offender, and all of his victims were other juveniles; by invalidating R.C. 2152.86, as applied to juveniles such as C.P., the majority leaves the public unaware of a significant number of sex offenders who are capable of reoffending, directly contrary to the intent of the General Assembly and contrary to our precedent and determinations of constitutionality that exist in our sister states.

{¶ 107} Moreover, this court has previously recognized that an offense committed as a juvenile may have adverse consequences on the offender as an adult. In *State v. Adkins*, 129 Ohio St.3d 287, 2011-Ohio-3141, 951 N.E.2d 766, we held that a juvenile adjudication could serve as one of the five prior similar offenses necessary to enhance a charge of operating a motor vehicle while under the influence of alcohol because R.C. 2901.08 expressly includes juvenile adjudications among the offenses that may be used for penalty enhancement. We specifically noted that "R.C. 2901.08 did not change [the] juvenile adjudication; it merely added another type of legal violation as an aggravating offense under R.C. 4511.19(G)(1)(d)." *Id.* at ¶ 17. Similarly, the requirements of R.C. 2152.86 do not convert a PRQJOR's adjudication into a criminal one.

{¶ 108} With respect to the argument that public registration constitutes punishment because of the potential for adversely affecting a juvenile's future employment, the Supreme Court of the United States has held occupational debarment to be regulatory, and therefore civil in nature. *See, e.g.*, *Hudson v. United States*, 522 U.S. 93, 104-105, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997); *De Veau v. Braisted*, 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960); *Hawker v. New York*, 170 U.S. 189, 196, 18 S.Ct. 573, 42 L.Ed. 1002 (1898).

{¶ 109} Nor is R.C. 2152.86 at odds with the goals promoted by R.C. 2152.01. The legislative intent underlying the enactment of R.C. 2152.86 was to

protect the public, and that goal is shared by R.C. 2152.01(A). The majority questions whether R.C. 2152.86 actually furthers public interest and public safety because juvenile judges have no discretion in determining if a juvenile is dangerous or what level of registration or notification would be adequate. "Questions concerning the wisdom of legislation are 'for the legislature, and whether the court agrees with it in that particular or not is of no consequence.' " *Butler v. Jordan*, 92 Ohio St.3d 354, 376, 750 N.E.2d 554 (2001) (Cook, J., concurring in judgment), quoting *State Bd. of Health v. Greenville*, 86 Ohio St. 1, 20, 98 N.E. 1019 (1912).

{¶ 110} R.C. 2152.86 also does not frustrate the purpose of Juv.R. 37(B), which is to protect children by keeping their juvenile court records confidential. First, the proceedings in juvenile court maintain their confidential status because the obligation to register does not arise until the successful completion of the juvenile disposition, *see* R.C. 2152.86(A)(2); thus, because the welfare of "a child" is no longer at stake, the underlying interest in confidentiality no longer exists. Second, the confidentiality requirement imposed by Juv.R. 37(B) is not applicable when statutes provide for disclosure; thus, R.C. 2152.86 supersedes the confidentiality provision of Juv.R. 37.

{¶ 111} For the foregoing reasons, the requirements of R.C. 2152.86 are not punitive and do not constitute cruel and unusual punishment. The General Assembly enacted R.C. 2152.86 pursuant to its authority and with the intent to protect the safety and welfare of the public. Moreover, it cannot be disputed that preventing crime "persists undiluted in the juvenile context." *Schall v. Martin*, 467 U.S. 253, 264, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). Thus, the statute is not unconstitutional.

**R.C. 2152.86 Meets the Requirements of Due Process
and Fundamental Fairness**

{¶ 112} Courts have rejected challenges to registration statutes based on alleged violations of due process. In *Connecticut Dept. of Pub. Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003), the Supreme Court construed Connecticut's version of Megan's Law and held that procedural due process did not entitle a convicted sex offender to a hearing on current dangerousness before requiring registration. The court found it unnecessary to determine whether registration deprived offenders of a liberty interest "because even assuming, *arguendo*, that [an offender] has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material under the Connecticut statute." *Id.* at 7. The court further explained that "[persons] who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme." *Id.* at 8. *See also People ex rel. Birkett v. Konetski*, 233 Ill.2d 185, 330 Ill.Dec. 761, 909 N.E.2d 783 (2009) (rejecting the argument that due process requires jury trial before a court may impose registration requirements on juveniles); *People ex rel. C.B.B.*, 75 P.3d 1148 (Colo.App.2003) ("C.B.B. has no procedural due process right to a hearing to prove a fact immaterial to the state's statutory scheme before being required to register as a sex offender under the Act").

{¶ 113} Rejecting a similar argument, the Ninth Circuit in *United States v. Juvenile Male*, explained:

> Additional process is only necessary where it gives a sex offender the ability to prove or disprove facts related to the applicability of the registration requirement. In other words, where "the law's requirements turn on an offender's conviction alone—a fact that a convicted offender has already had a procedurally safeguarded

44

opportunity to contest"—no additional process is required for due process. *Doe v. Tandeske*, 361 F.3d 594, 596 (9th Cir.2004). In this case, juvenile sex offenders are required to register on the basis of their adjudicated juvenile status, which explicitly triggers SORNA's requirements under 42 U.S.C. § 16913. Thus, because defendants are not challenging whether they received adequate due process in their juvenile proceedings, there is no basis for a procedural due process claim.

Further, adequate procedural safeguards at the conviction stage are sufficient to obviate the need for any additional process at the registration stage.

*Juvenile Male*, 670 F.3d at 1014.

{¶ 114} As applied here, C.P. cannot establish a due process violation based on the fact that R.C. 2152.86 imposes *automatic* registration, as opposed to registration imposed by an exercise of judicial discretion, because whether a juvenile sex offender has been sufficiently rehabilitated is not material to the statute's operation; it is the adjudication that triggers the duty to register. There is no constitutional requirement that juveniles must receive greater due process than adults.

{¶ 115} Discretion is a matter of grace and not of right. Thus, the General Assembly was within its authority to impose automatic registration on juvenile sex offenders when it enacted R.C. 2152.86. Accordingly, the statute meets the requirements of due process and does not offend notions of fundamental fairness.

### Conclusion

{¶ 116} R.C. 2152.86 is constitutional and does not violate the prohibition against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution or the Ohio Constitution, Article I, Section 9, nor does

it violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution or the Ohio Constitution, Article I, Section 16.

{¶ 117} The General Assembly enacted R.C. 2152.86 pursuant to its proper authority and in furtherance of the legitimate goals of public safety and public welfare. It is not the function of this court to substitute its judgment for that of the General Assembly.

{¶ 118} For these reasons, I would affirm the judgment of the court of appeals and hold that R.C. 2152.86 is constitutional.

_____

**CUPP, J., dissenting.**

{¶ 119} For a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, as a general matter, the punishment in question must be "grossly disproportionate" to the crime's severity. *See Graham v. Florida*, ___ U.S. ___, 130 S.Ct. 2011, 2037, 176 L.Ed.2d 825 (2010) (Roberts, C.J., concurring in judgment) (the Eighth Amendment does not require strict proportionality between the crime and the sentence, but forbids only extreme sentences that are grossly disproportionate to the crime). This "narrow proportionality" standard is highly deferential and strongly favors upholding a punishment that has been imposed as authorized by a particular statute. It sets a very high bar for a challenger claiming a violation of the Eighth Amendment's ban to overcome. Judges do not possess blanket authority to second guess decisions of legislatures or sentencing courts. *Id.* Successful Eighth Amendment challenges to noncapital sentences are " 'exceedingly rare.' " *Id.*, quoting *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

{¶ 120} This court has similarly recognized the high bar a challenger asserting cruel and unusual punishment must overcome. In *State v. Chaffin*, 30 Ohio St.2d 13, 17-18, 282 N.E.2d 46 (1972), this court upheld the imposition of a 20- to 40-year prison sentence for a defendant convicted of selling cannabis,

rejecting the defendant's contention that his punishment was cruel and unusual. Paragraph three of the *Chaffin* syllabus held that a punishment is not cruel and unusual unless the punishment is "so greatly disproportionate to the offense as to shock the sense of justice of the community." *See also State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 13-14 (reiterating the validity of the "gross disproportionality" standard and acknowledging that it can be met only in a very limited number of cases).

{¶ 121} When reviewing a particular juvenile punishment for an Eighth Amendment violation, an offender's status as a juvenile must be taken into account because juveniles are typically less culpable than adults due to their youth and immaturity. *Graham*, ___ U.S. at ___, 130 S.Ct. at 2039-2040, 176 L.Ed.2d 825 (Roberts, C.J., concurring in judgment). However, the general standards of gross disproportionality and substantial deference to the legislative judgment expressed within the relevant statute are not to be abandoned merely because the offender is a juvenile.

{¶ 122} I dissented in *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, because I could not find, as the majority did, that certain portions of 2007 Am.Sub.S.B. No. 10 ("S.B. 10") are punitive in nature for purposes of a retroactivity analysis pursuant to the Ohio Constitution, Article II, Section 28. I acknowledge, however, that *Williams* must be regarded as established precedent on the issues it resolved. Further, as the majority opinion in this case recognizes, the United States Supreme Court in *Graham* recently held that the Eighth Amendment's prohibition of the infliction of cruel and unusual punishment is violated when a juvenile offender who did not commit homicide receives a sentence of life imprisonment without possibility of parole.

{¶ 123} But the sex-offender registration and notification provisions at issue in this case are so significantly different from the punishment at issue in *Graham*—lifetime imprisonment with no chance of parole, with its fundamental

loss of liberty—that I am left wondering how the two can possibly be considered comparable for constitutional purposes.

{¶ 124} Although the provisions of R.C. 2152.86 subjecting certain juveniles to automatic lifetime registration and notification requirements, with a potential for reclassification after 25 years, may be viewed as highly burdensome or even onerous, they do not reach that high level of punishment that the United States Supreme Court has held categorically unconstitutional. The punishments held by the United States Supreme Court to violate the Eighth Amendment ban when applied to juveniles are the death penalty, *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and lifetime imprisonment without the possibility of parole for serious, but non-homicide, crimes. *Graham*, ___ U.S. ___, 130 S.Ct. 2011, 176 L.Ed.2d 825. I do not find the requirements at issue here pertaining to registration and notification to rise to such a level as to be even remotely comparable.

{¶ 125} The statutory requirements at issue apply only to a small and select category of juvenile offenders—those who have committed the most serious sex offenses after reaching the age of 14 and who have ultimately received a disposition as a serious youthful offender ("SYO") after all the procedural steps of the SYO process have been fulfilled. The General Assembly has determined that these offenders pose a special danger to public safety that separates them from all other juvenile offenders. R.C. 2152.86 assigns only offenders of this type to the special category of public-registry-qualified juvenile-offender registrants, or PRQJORs.

{¶ 126} Under R.C. 2152.86, all juveniles who commit sex offenses before their 14th birthday, those juvenile sex offenders over the age of 14 who commit less serious offenses than C.P. committed, and those offenders who have not received a SYO disposition are not considered PRQJORs. R.C. 2152.86(A)(1). The General Assembly's differentiations in this regard are not

unreasonable in light of its objective of protecting the public, and the determinations are entitled to substantial deference.

{¶ 127} Justice O'Donnell's dissenting opinion makes clear that C.P.'s offenses, if committed by an adult, would have potentially resulted in convictions for three first-degree felonies and a very long prison sentence, thus highlighting the seriousness of C.P.'s conduct that the majority opinion merely mentions in passing. C.P.'s status as a PRQJOR is a direct consequence of his own actions.

{¶ 128} The *Graham* court majority's decision to adopt a categorical rule as to the particular issue raised in that case was driven by two critical considerations. First, juvenile offenders who did not kill or intend to kill have a "twice diminished moral culpability," *Graham*, ___ U.S. at ___, 130 S.Ct. at 2027, 176 L.Ed.2d 825, because (1) they are juveniles, who in general lack maturity, are vulnerable to negative influences, and are more capable of change than adults, *id*. at 2026, and (2) their offenses are not deserving of the most serious forms of punishment, which should be reserved for adults who commit murder. *Id.* at 2026-2027. Second, sentences of life in prison without parole "share some characteristics with death sentences that are shared by no other sentences," including irrevocability, and therefore must be regarded as "especially harsh punishment for a juvenile." *Id*. at 2027 and 2028. The court in *Graham* thus concluded that the high bar that must be overcome for a punishment to be deemed cruel and unusual was met largely because of the exceptionally harsh punishment a sentence of life imprisonment without parole entails.

{¶ 129} In the present case, however, the majority unjustifiably relies on the offender's juvenile status to minimize the substantial bar the challenger must surmount to establish cruel and unusual punishment. In place of that substantial bar, the majority substitutes a threshold that bears no resemblance to the threshold applied in the review of the death penalty in *Roper* or the review of the sentence of life imprisonment with no possibility of parole in *Graham*. The punishment

under scrutiny in *Graham* deprived the juvenile offender in that case of "the most basic liberties without giving hope of restoration" because the offender was to be imprisoned for life with absolutely no prospect of parole. *Id.* at 2027. In contrast, most courts have held that sex-offender notification and registration requirements of the type at issue in this case are not even "punishment" for purposes of the Eighth Amendment, even if the requirements do place heavy burdens on an offender. *See United States v. Juvenile Male*, 670 F.3d 999, 1010-1011 (9th Cir.2012), and other cases cited and discussed in Justice O'Donnell's dissent. The sex-offender notification and registration requirements at issue here, while burdensome, simply do not approach the severity of the punishments at issue in *Graham* or *Roper*.

{¶ 130} The majority opinion, unfortunately, fails to acknowledge this fundamental difference, even as it repeatedly compares the requirements in this case to the punishment of lifetime imprisonment in *Graham*. Instead, it appears to stage-manage the *Graham* factors in order to reach its own preferred policy result.

{¶ 131} In so doing, the majority opinion completely loses sight of the overriding meaning of the standards applicable in cases of this nature. Although the registration and public-disclosure provisions at issue in this case are criticized by some as imprudent and too harsh, a demonstration of *simple* disproportionality is not enough to support a finding of an Eighth Amendment violation—the disproportionality must be *great*. Taking into account the very serious offenses C.P. committed, as delineated in Justice O'Donnell's dissent, the disproportionality here is not of such a magnitude that it contravenes the constitutional proscription against cruel and unusual punishment.

{¶ 132} Additionally, I am unable to agree with the majority's determination that R.C. 2152.86 violates due process principles. The majority's finding of fundamental unfairness fails to take into account that PRQJORs such as

C.P. reach that status only by undergoing a rigorous narrowing process designed to exclude most juvenile sex offenders. R.C. 2152.13. The statute at issue provides adequate procedural safeguards for those offenders who are not excluded, and who are ultimately assigned PRQJOR status, to satisfy due process concerns.

{¶ 133} Finally, the majority's analysis leaves unanswered a multitude of additional issues that its conclusions generate. As a result, the trial court will be forced to guess what is actually required in this case upon remand. I note just two of these unanswered questions.

{¶ 134} First, the majority opinion concludes that the lack of discretion afforded to a juvenile judge by R.C. 2152.86 in assigning the PRQJOR designation is a significant infirmity in the statute bearing upon its constitutionality. The syllabus states that the statutory provisions are unenforceable only "[t]*o the extent that*" R.C. 2152.86 "imposes automatic, lifelong registration and notification requirements on juvenile sex offenders tried within the juvenile system." (Emphasis added.) Does this mean that a juvenile judge may now, notwithstanding the statute, exercise discretion as to whether to impose sex-offender notification and reporting requirements on PRQJOR-status offenders such as C.P.? If so, what are the boundaries of that discretion?

{¶ 135} Second, another constitutional infirmity of the statute, according to the majority opinion, is that the registration and notification requirements are lifelong (with a possibility for adjustment after 25 years). May a juvenile judge in the exercise of discretion now impose requirements of shorter duration on offenders such as C.P. and overcome the constitutional deficiencies? If so, what duration will satisfy the majority's concerns?

{¶ 136} It is not just the juvenile judge in this particular case who must decipher the meaning of this court's analysis. This decision will also affect other juvenile offenders and the juvenile judges who will preside over their cases. This

court apparently leaves it to those judges to unravel the mysteries of this decision's application. Moreover, should the General Assembly seek to revise the statute to conform with this court's decision, it will have a difficult time discerning the new Eighth Amendment boundaries that the decision creates.

{¶ 137} I am unable to agree that the provisions of R.C. 2152.86 at issue violate either the United States or Ohio constitutional prohibitions against cruel and unusual punishment and the requirements of due process. I would hold that the provisions under consideration survive constitutional scrutiny and would affirm the judgment of the court of appeals. Therefore, I respectfully dissent.

_____

C. David Warren, Athens County Prosecuting Attorney, and George Reitmeier, Assistant Prosecuting Attorney, for appellee, state of Ohio.

Timothy Young, State Public Defender, and Brooke M. Burns, Assistant Public Defender, for appellant, C.P.

Nadia Seeratan, urging reversal for amici curiae National Juvenile Defender Center, Association for the Treatment of Sexual Abusers, Central Juvenile Defender Center, Juvenile Justice Coalition, Ohio Justice and Policy Center, Dr. Elizabeth J. Letourneau, and Dr. Morris Jenkins.

Kim Tandy, urging reversal for amicus curiae Children's Law Center, Inc.

Gamso, Helmick & Hoolahan and Jeffrey M. Gamso; and James L. Hardiman and Carrie L. Davis, urging reversal for amicus curiae American Civil Liberties Union of Ohio Foundation, Inc.

Michael DeWine, Attorney General, Benjamin C. Mizer, Solicitor General, Alexandra T. Schimmer, Chief Deputy Solicitor General, and Laura Eddleman Heim, Deputy Solicitor, urging affirmance for amicus curiae Ohio Attorney General.

_____