KATHLEEN ANN KEOUGH, J., DISSENTING:
 

 {¶ 72} This case represents how our juvenile justice system has failed our juveniles. Much emphasis has been placed on
 A.W.'s failures, which I am not discounting. However, when a system that is put in place to protect our most vulnerable while protecting our community fails, we cannot put the entire blame on A.W. to justify the invocation of the adult portion of his sentence. The system in this case sabotaged any effort that A.W. made or could have made to prevent the adult portion of his sentence to be invoked. The dangling carrot was never going to be caught.
 

 A. The system failed the community by failing to execute the initial arrest warrant, yet blamed A.W. for going "AWOL" on two occasions.
 

 {¶ 73} On April 22, 2014, the state filed a complaint against A.W., then age 17, for sex offenses committed in 2013. On that same day, the state requested that an arrest warrant for A.W. be issued, and the juvenile court conducted a hearing. The court subsequently issued a journal entry stating that the matter came for a hearing on April 22, 2014, and "notwithstanding receipt of notice, the youth has failed to appear." Accordingly, the juvenile court issued an arrest warrant for A.W. that day. The record is completely silent on how, if, or when A.W. received notice that a complaint was filed against him, that the state requested a warrant be issued, and that the court was hearing the matter, which all occurred on April 22, 2014. Yet the juvenile court and A.W.'s parole officer at ODYS blamed him for going "AWOL" during that time. The record is also silent as to what attempts were made to apprehend A.W. during this time until his arrest on May 26, 2015, over a year later, when A.W. was 18 years old.
 

 {¶ 74} On May 26, 2015, when A.W. appeared in juvenile court for another matter, he was arrested and arraigned for this case. Admittedly, A.W. failed to appear for a pretrial on September 10, 2015, and a warrant was issued for his arrest. Despite his flight, the record is again silent as to what attempts were made to apprehend A.W. during this time. When A.W. was finally apprehended on May 8, 2016, he was age 19.
 

 {¶ 75} I point this out for two reasons. First, A.W. did not go "AWOL" on two occasions. So any delay in his adjudication from the time of the complaint until his arrest in May 2015 should not be attributed to him. And secondly, the state made an issue of A.W.'s criminal history and the danger he posed to the community, yet failed to show what steps it took to secure his appearance other than simply having an arrest warrant issued.
 

 B. The system failed A.W. in the delay of prosecution.
 

 {¶ 76} Once A.W. was apprehended, the probable cause hearing was originally scheduled for June 28, 2016, but was continued due to an unavailable state's witness. The probable cause hearing, which turned into an adjudication hearing, finally occurred on September 7 and 13, 2016. A.W. was now 20 years old. At this time, the state and the juvenile court knew that any mandatory programs or treatment in ODYS would be for less than eight months before A.W.'s 21st birthday, yet they believed A.W. could be rehabilitated in the juvenile justice system.
 

 C. The system failed A.W. by giving him false hope during adjudication
 

 {¶ 77} At the time of adjudication, prior to A.W. making his admission to the amended complaint, the court made the following statements on the record:
 

 So he will stay in Juvenile Court. And the
 
 only way
 
 you will go to Adult Court, young man, is
 
 if you act out so badly at ODYS
 
 that they cannot handle you. Meaning, that you continually fight, you
 continually create delinquent acts. Once you are 21 years of age, this Court loses jurisdiction and the SYO, what we call the serious youth offender specification, goes away. Does that make sense?
 

 (September 13, 2016 tr. 79.). Following this advisement, the court engaged in a conversation with A.W., his mother, and defense counsel explaining the types of behavior that would warrant the imposition of the adult portion of his sentence - "I don't mean just get into random fights. I mean he literally refuses to follow any of the rules and is constantly [a problem]. * * * And I mean serious. * * * So it has to be fairly severe." (
 
 Id
 
 . at tr. 79-80). The court continued explaining that if he engaged in these types of behaviors, A.W. would come back before the court and following a hearing, the court would determine whether "he in fact is an aggressor and I need to invoke the serious youth offender." (
 
 Id
 
 . at tr. 81.) Defense counsel also read on the record the language in R.C. 2152.14(B) that governs under what circumstances the SYO dispositional sentence will be invoked.
 

 {¶ 78} Thereafter, the juvenile court engaged in the requisite plea colloquy with A.W. and he admitted to the charges in the delinquency complaint. During the plea colloquy, the juvenile court vaguely advised A.W. that "if in fact you don't do what you're supposed to do in ODYS, that they can impose the sentence and you can be sentenced from anywhere between 3 to 11 years * * *." However, at no time during his plea, did the court explain to A.W. that the adult portion of his sentence would be invoked for failing to comply with counseling, treatment, or any other programs ODYS ordered.
 

 D. The system failed A.W. by depriving him of due process
 

 {¶ 79} In addition to protection against the deprivation of "life, liberty, or property without due process of law," juveniles, at a minimum, "are entitled to proceedings that 'measure up to the essentials of due process and fair treatment.' "
 
 In re J.V.
 

 134 Ohio St.3d 1
 
 ,
 
 2012-Ohio-4961
 
 ,
 
 979 N.E.2d 1203
 
 , ¶ 14, quoting
 
 Kent v. United States
 
 ,
 
 383 U.S. 541
 
 , 562,
 
 86 S.Ct. 1045
 
 ,
 
 16 L.Ed.2d 84
 
 (1966). The fair warning or notice requirement of the Due Process Clause prohibits an individual from being held " 'criminally responsible for conduct which he could not reasonably understand to be proscribed.' "
 
 Rose
 
 ,
 
 423 U.S. at 49
 
 ,
 
 96 S.Ct. 243
 
 , quoting
 
 United States v. Harriss
 
 ,
 
 347 U.S. 612
 
 , 617,
 
 74 S.Ct. 808
 
 ,
 
 98 L.Ed. 989
 
 (1954). Although the nature of the due process clause defies a rigid application in juvenile cases, the Ohio Supreme Court has held that " 'fundamental fairness is the overarching concern.' "
 
 In re C.P.
 
 ,
 
 131 Ohio St.3d 513
 
 ,
 
 2012-Ohio-1446
 
 ,
 
 967 N.E.2d 729
 
 , ¶ 71, quoting
 
 D.H
 
 .,
 
 120 Ohio St.3d 540
 
 ,
 
 2009-Ohio-9
 
 ,
 
 901 N.E.2d 209
 
 , at ¶ 51.
 

 1. No Order for Sex Offender Treatment
 

 {¶ 80} As the majority correctly points out, the juvenile court did not specifically order sex offender treatment in its dispositional judgment entry, and any attempt to "correct" that order was a nullity. Additionally, I agree that R.C. 5139.04 allows ODYS to "issue any orders" for the treatment of the children. However, the evidence in the record is insufficient to conclude that ODYS "ordered" A.W. to participate in sex offender treatment. Contrary to the majority's assertion, at no time during the first review hearing on January 18, 2017, did Officer Dansby testify that A.W. was
 
 ordered
 
 to participate in sex offender treatment. She stated:
 

 [A.W.] continues to deny the accusations. He does not participate in any type of treatment. And according to [the] latest report they have given him
 until January 31st to weigh his options as to whether he'll participate in treatment or not, but as of this date he's not participating.
 

 (January 18, 2017 tr. 4.) Morever, Dr. Alpert later testified at a subsequent hearing, that she
 
 invited
 
 A.W. to attend her group session in December, which A.W. declined. Accordingly, I cannot say that A.W. was ordered to attend sex offender treatment.
 

 {¶ 81} Furthermore, I find it reasonable to believe that if ODYS felt that it could order A.W. to engage in sex offender treatment, then there was no necessity for ODYS to confirm with the juvenile court whether treatment "was ordered in the journal entry."
 

 THE COURT: Okay. All right. So I guess you can take him back. Do you need me to order anything specific, Officer Dansby?
 

 MS. DANSBY: No.
 

 THE COURT: Can you remind him of this conversation when he says, I'm not doing anything?
 

 MS. DANSBY: Yeah, I mean, it's in the journal entry, right, that he has to have sex offender treatment?
 

 THE COURT: Yes.
 

 MS. DANSBY: Okay. That's all they need.
 

 (January 18, 2017 tr. 10-11.)
 

 {¶ 82} Although it is true that the juvenile court "wanted" A.W. to receive sex offender treatment, no order was issued requiring that he participate or complete treatment. When dealing with individuals in the juvenile justice system, I am mindful that unless they are specifically ordered to do a task and advised of the consequences, it is likely that they will not engage in that activity willingly or voluntarily. This is evidenced by A.W.'s understanding at the January 18, 2017 review hearing, when the juvenile court for the first time advised A.W. that he must participate in sex offender treatment or the adult portion of his sentence would be imposed. A.W. unequivocally stated he understood, and contrary to the majority's position, nothing in the record demonstrates that A.W. refused to participate in such treatment following the court's order. The juvenile court's ultimatum occurred five months before A.W.'s 21st birthday.
 

 2. No Notice of Consequences
 

 {¶ 83} I also disagree with the majority's conclusion that A.W. knew at the time of disposition that sex offender treatment would be part of his rehabilitation program and that his failure to participate in sex offender treatment would result in invocation of his adult sentence. Rather, the record reflects that at no time during disposition did the trial court order such treatment or advise him of the consequences for failing to participate.
 

 {¶ 84} Granted, the juvenile court judge stated during the dispositional hearing that she would bring him back for a review hearing and if he was not doing what he was supposed to, she would "cut the sentence at ODYS and send [A.W.] to prison." (October 12, 2016 tr. 17-18). However, I find this statement insufficient to apprise A.W. of the consequences of failing to participate in sex offender treatment, considering the juvenile court's subsequent statement:
 

 [a]nd if you're still doing everything
 
 you can
 
 by May 23, 2017, you
 
 will have completed
 
 the terms of Juvenile Court, the SYO, the serious youth offender sentence, will go away and you can then go on and live your life.
 

 (
 
 Id
 
 . at tr. 18.)
 

 {¶ 85} It must be remembered that when A.W. entered his admission to the amended delinquency complaint, the juvenile
 court was clear with A.W. that the only conduct that would lead to the invocation of his adult sentence were further delinquent acts. Specifically, A.W. was on notice that his adult sentence would be invoked only if he acted up at ODYS.
 

 {¶ 86} Subsequently at the disposition hearing, the court vaguely advised A.W. that he could be sent to prison if he "mess[es] up at ODYS at any given time," and "if, in fact, you are not doing what you're supposed to." (October 12, 2016 tr. 15, 17.) And while the juvenile court indicated at disposition that it wanted sex offender treatment put in place at ODYS, it never advised A.W. or issued an order that his failure to participate in treatment would warrant invocation of his adult sentence.
 

 {¶ 87} Constitutional due process requires that A.W. have specific notice of the conduct that could lead to the invocation of his adult sentence. When, as here, he was told that his adult sentence would only be invoked by his engaging in delinquent acts, his due process rights were violated when his adult sentence was invoked for some other condition - failing to sufficiently participate or engage in sex offender treatment.
 

 3. No Chance to Satisfy - Factual Impossibility
 

 {¶ 88} The majority summarily disposes of A.W.'s argument that his due process rights were violated when the juvenile court invoked his adult sentence based upon his failure to complete sex offender treatment despite the factual impossibility of him completing such treatment given the short duration of his ODYS commitment. The majority concludes that the court never conditioned the adult portion of his sentence on the
 
 completion
 
 of "the entire sex offender program," because the court only stated at the dispositional hearing that it wanted sex offender treatment put in place at ODYS and for A.W. "to have a better understanding of what's appropriate and what's not." I agree that this was the juvenile court's statement and initial position. However, the record demonstrates that this condition drastically changed following his commitment to ODYS when the court on January 20, 2017, subsequently ordered A.W. to fully participate in sex offender treatment, and stated that failure to do so would result in the invocation of the adult portion of his sentence. Moreover, the juvenile court only required A.W. to participate in treatment, which he did, although apparently not to the satisfaction of ODYS and the juvenile court.
 

 {¶ 89} The majority's statement that if A.W. had "taken responsibility for his actions and taken his sex offender treatment seriously when he entered ODYS, he could have avoided the adult sentence even if he did not complete the entire sex offender program" is mere speculation on what the juvenile court would have done considering at all relevant times the individuals at ODYS felt prison was the better option for A.W. Morever, I fail to understand the majority's conclusion that the juvenile court's statement made at the January 2017 review hearing that "he's doing well" equates that A.W. was "making progress" toward "what's appropriate" when he had yet to start sex offender treatment.
 

 {¶ 90} The evidence in the record is clear that A.W. was unfairly punished for a factual impossibility. It must be noted that even though A.W. entered ODYS in November 2016, he was not assessed for his treatment needs until December 2016. At that point, he only had approximately six months remaining on his ODYS commitment to fully participate in a nine-month sex offender program.
 

 {¶ 91} Both A.W.'s treating psychologist and supervising psychologist at ODYS
 

 were clear that given the abbreviated duration of A.W.'s ODYS commitment, it would have been impossible for A.W. to complete the sex offender treatment programming. Dr. Alpert testified that "[e]ven if [A.W.] would have engaged in sex offender treatment on his first day in ODYS, that would not be enough time," because treatment is at least nine months and A.W., given his "vast amount of issues," may have required even more time. Dr. Greene likewise testified that even if A.W. had begun his sex offender treatment at the beginning of his ODYS commitment, he "could potentially be, you know, 60 to 70% done though it's very variable." (May 22, 2017 tr. 9.)
 

 {¶ 92} This factual impossibility was exacerbated by the unreasonable delay in A.W.'s treatment caused by ODYS. At no time during the January 18, 2017 hearing when the court ordered sex offender treatment, did anyone indicate to the court that treatment would be delayed due to the scheduling procedures and treatment preferences of ODYS, or that A.W. would not even satisfactorily "scratch the surface" of the treatment before his 21st birthday.
 

 {¶ 93} Moreover, despite the juvenile court's order that AW either participate in sex offender treatment or go to prison, ODYS did not make treatment available to A.W. for over 70 days even though A.W. agreed to participate. Furthermore, the record reflects that no one from ODYS advised the court prior to the March 31, 2017 hearing that treatment was not made available to A.W. At that hearing, Dr. Alpert admitted to A.W.'s willingness:
 

 Okay. When he came back [from being in court in January], his social worker let me know that he wanted to meet with me again. So I did meet with him at the very beginning of February. At that time he was very forthcoming about his sex offending.
 

 (March 31, 2017 tr. 5.)
 

 {¶ 94} The Court was bewildered to learn about the delay in treatment, stating:
 

 So how - I don't understand - even though you have a closed group and I understand that, how did we not go to Plan B and figure out how to get him the required sex offender treatment? It's been two months now where I ordered him to do something. He agreed to do it and we're the ones that are failing him?
 

 (March 31, 2017 tr. 6.) I agree with the juvenile court that the system was failing A.W. The record is clear that the juvenile court acknowledged during the March 31, 2017 hearing that the delay in implementing sex offender treatment from January to April was the fault of the scheduling procedures at ODYS, and placed the blame squarely upon the institution. The juvenile court was very troubled and actually asked for guidance about when she brought A.W. back in April, "are we going to say that he has fulfilled the requirement that this Court set forth for his treatment?" (
 
 Id
 
 . at tr. 8). In my belief, the only person looking out for A.W. was the juvenile court. It was the court that was finding solutions to the situation and making suggestions, whereas the institution was placing blame on A.W., upset that they had to make special arrangements for him and reminding him that he was "not special." (
 
 Id
 
 ., tr. at 9, 15.)
 

 {¶ 95} Thereupon, the juvenile court made, what I perceive to be, a promise to A.W.:
 

 THE COURT: All right. So what we're going to do is you're going to start and April 5th you're going to do the sex offender treatment. We're going to accelerate it by doing an individual group program along with it. And then what I'm going to do is - when do you turn
 21, May 23rd? * * * So we're going to push your April 21st [review hearing] into May
 
 and if you do everything you're supposed to, I will not impose your SYO
 
 . Okay? Do we got a deal?
 

 A.W.: Yes, your honor.
 

 (Emphasis added.) (
 
 Id
 
 ., tr. 10.)
 

 {¶ 96} Following the review hearing, the court issued another journal entry:
 

 Although the youth was committed for a sex offense, [A.W.] was refusing in December 2016 to take responsibility for his actions nor participate in sex offender treatment. In February, the youth expressed that he would like to participate in Sex Offender Treatment, although he was told that the next class was not until April 5, 2017 and would take approximately nine months. The youth turns twenty-one on May 23, 2017 and needs to complete as much of the program as he can. [ODYS] agreed to give him an additional individualized program to accelerate the youth's progress.
 

 IT IS THEREFORE ORDERED that the youth shall participate and engage in individualized sex offender treatment. [ODYS] shall ensure that individualized services are offered to the youth.
 

 IT IS FURTHER ORDERED that the youth shall fully cooperate, including but not limited to engaging in services in the evenings and weekends. Failure to engage with services may result in the Serious Youth Offender disposition being invoked.
 

 (Apr. 3, 2017 Journal Entry).
 

 {¶ 97} I am not turning a blind eye to the fact that A.W. could have started treatment following his assessment in December, but on January 18, 2017, when everyone was in agreement that counseling was mandatory and failure to do so unequivocally warranted the imposition of his adult portion of his sentence, no programs, treatment sessions, or counseling services were made available to A.W. until after March 31, 2017. This was over 72 days - for 72 days the system failed A.W.
 

 {¶ 98} In addition to not providing adequate notice of the existence of court-ordered sex offender treatment and consequences, the proceedings in this case do not "measure up to the essentials of due process and fair treatment" because it was impossible to meet the court's unstated expectation that A.W. complete sex offender treatment at ODYS to everyone's satisfaction. The conditions and consequences kept changing, causing the invocation of A.W.'s adult sentence to be based on a flawed and fundamentally unfair premise, which violates the very fabric of the Due Process Clause.
 

 {¶ 99} Accordingly, I would find that A.W. was deprived due process of law when the juvenile court invoked the adult portion of his sentence.
 

 E. No Evidence of Misconduct - Fifth Amendment Violation
 

 {¶ 100} Furthermore, once it was discovered that it was impossible to complete sex offender treatment to the state's satisfaction, and A.W. had not engaged in the requisite misconduct to warrant invocation of his adult sentence, A.W.'s incriminating statements made during treatment were used against him to justify the invocation of the serious youth offender specification under the guise that he creates a substantial risk to the safety or security of the community.
 

 {¶ 101} I agree with the majority's analysis and conclusion that A.W.'s Fifth Amendment privilege against self-incrimination was violated when the juvenile court relied on statements A.W. made to his therapists during sex offender treatment to justify the imposition of the adult portion
 of his sentence. I further agree that the remedy for this violation is suppression of the tainted evidence, and that A.W.'s incriminating statements could not be used as a basis for invoking the adult sentence.
 

 {¶ 102} However, I disagree with the majority's conclusion that even absent these statements, the weight of the evidence supports the juvenile court's decision to invoke A.W.'s adult sentence. The majority concludes that failure to actively participate in sex offender treatment constitutes misconduct under R.C. 2152.14(E)(1)(c) if the failure to participate results in inadequate rehabilitation. In some cases this may be true, but as it pertains to the facts presented in this case, I disagree.
 

 {¶ 103} A juvenile court may invoke the adult portion of a person's serious youthful offender sentence if it finds by clear and convincing evidence that "the person engaged in the conduct or acts charged under division (A), (B), or (C) of [ R.C. 2152.14 ],
 
 and
 
 the person's conduct demonstrates that the person is unlikely to be rehabilitated during the remaining period of juvenile detention." (Emphasis added.) R.C. 2152.14(A)(1)(c).
 

 {¶ 104} "The conduct that can result in the enforcement of an adult sentence includes committing, while in custody or on parole, an act that is a violation of the rules of the institution or the conditions of supervision and that could be charged as any felony or as a first-degree misdemeanor offense of violence if committed by an adult, R.C. 2152.14(A)(2)(a) and (B)(1), or engaging in conduct that creates a substantial risk to the safety and security of the institution, the community, or the victim. RC. 2152.14(A)(2)(b) and (B)(2)."
 
 D.H.
 
 ,
 
 120 Ohio St.3d 540
 
 ,
 
 2009-Ohio-9
 
 ,
 
 901 N.E.2d 209
 
 , at ¶ 36.
 

 {¶ 105} There is no dispute that A.W. did not commit an act that could be charged as a felony or first-degree misdemeanor. The issue is whether the failure to sufficiently complete sex offender treatment satisfies the requirement of "engaging in conduct that creates a substantial risk to the safety and security of the institution, the community, or the victim."
 

 {¶ 106} In support of its conclusion, the majority cites to the Ninth District's recent decision in
 
 In re D.J
 
 ., 9th Dist. Summit Nos. 28472 and 28473,
 
 2018-Ohio-569
 
 ,
 
 2018 WL 847102
 
 .
 
 [3]
 

 {¶ 107} D.J., age 15, was committed to ODYS following an adjudication for rape and felony murder. He appealed his adjudication, but after doing well during his commitment, he dismissed his appeal. Following the dismissal, the juvenile court noted that D.J.'s sex offender treatment would begin, but D.J. refused to enter the program until nine months before turning 21 years of age. Although he attended and participated in the first phase of the program, he did not meet his goals because he would not identify the triggers for his conduct. This prevented him from continuing with the second phase of his treatment.
 

 {¶ 108} Less than two months before D.J.'s 21st birthday, the state moved to invoke the adult portion of his sentence. Following a hearing, the juvenile court granted the motion, finding that by failing to complete sex offender treatment, D.J. engaged in conduct that posed a substantial risk to the safety of the community, and that he could not be rehabilitated before turning 21.
 

 {¶ 109} The Ninth District affirmed the juvenile court's decision. It concluded that D.J. had 29 months to complete sex offender
 treatment, which typically takes between 9 and 18 months. And by intentionally waiting until he had only 9 months prior to turning 21 to begin treatment, it was too late to finish the treatment in light of his minimal participation and emotional detachment from his offense. The court concluded that D.J., in failing to complete sex offender treatment, engaged in conduct that created a substantial risk to the safety of the community.
 

 {¶ 110} The facts and circumstances in
 
 D.J
 
 . are distinguishable. The most glaring distinction is that D.J. had over 29 months to complete sex offender treatment. His commitment to ODYS did not create an impossibility, unlike A.W.'s six-month commitment. Additionally, the facts in
 
 D.J
 
 . indicate that the juvenile court ordered sex offender treatment during the disposition hearing. In this case, the juvenile court did not order A.W. to participate and engage in sex offender treatment during disposition. D.J. also refused to participate in treatment from the beginning of his commitment up until nine months before his 21st birthday - he refused for almost two years. Whereas in this case and contrary to the majority's statement, A.W. did not refuse to participate in sex offender treatment once he was ordered to participate and advised that failure to do so would result in the invocation of his adult sentence.
 

 {¶ 111} Finally, the facts in
 
 D.J.
 
 indicate that D.J. obtained no benefit from the sex offender treatment that he did receive, whereas the facts here show that A.W. responded well to individualized treatment, and despite only completing seven of the 35 lessons in the first phase of the program, A.W. was benefitting. Dr. Greene, his individual therapist, testified that A.W. was very engaged and did the work. Bonita Reaves, the social worker who facilitated the group therapy, testified that A.W. did well in group, was always on time, did a lot of sharing, asked relevant questions, and completed all of his homework assignments.
 

 {¶ 112} In addition to his therapists testifying that A.W. was engaged in treatment, A.W.'s social worker, Dorothy Chapman, advised the court that A.W. participated and completed his substance abuse group, completed aftercare group, and participated in his education requirement. She stated, "[H]e reports his goals for the next 30 days as completing or participating in SO program as required, completing Phase 2 of the substance abuse and completing successfully and continue to attend the [inaudible] support group that we have in place." (May 8, 2017 tr. 7.).
 

 {¶ 113} Accordingly, I find
 
 D.J
 
 . distinguishable from the facts in this case. Moreover, I doubt that failure to adequately engage in treatment and achieve certain desired results is the type of misconduct that the General Assembly intended when it drafted R.C. 2152.14(E)(1)(c).
 

 {¶ 114} The juvenile court rescinded its promise about not invoking the adult portion of A.W.'s sentence only after A.W.'s incriminating statements made during treatment were relayed to the court. I agree with A.W. that the juvenile court must have relied on his incriminating statements when it imposed his adult sentence because (1) A.W. did not engage in any further wrongdoing or bad acts at ODYS, such as fighting or causing disruption, and (2) the other admissible and untainted evidence establishes that A.W. was doing the best he could in the time he had, which was complying with the exact order the juvenile court issued at the March 31, 2017 hearing.
 

 {¶ 115} The majority notes that Dr. Alpert testified that A.W. was only "superficially engaged" in group treatment. The
 rationale for this conclusion, however, was based on A.W.'s incriminating statements - statements that should have been suppressed. Additionally, the majority relies on Dr. Palmer's statement that A.W. only attended the classes because he wanted to avoid prison, not to reform his behavior. However, as the Ohio Supreme Court has noted, "the threat of the imposition of an adult sentence encourages a juvenile's cooperation in his own rehabilitation, functioning as both carrot and stick."
 
 D.H
 
 .,
 
 120 Ohio St.3d 540
 
 ,
 
 2009-Ohio-9
 
 ,
 
 901 N.E.2d 209
 
 , at ¶ 18. Accordingly, it is not surprising that A.W.'s motivation in cooperating with his own rehabilitation would be to avoid an adult sentence.
 

 F. Conclusion
 

 {¶ 116} In my opinion, the record is very clear. A.W. was sentenced to ODYS for approximately 6 months before turning 21 years old. Five months before turning 21, he was ordered for the first time by the juvenile court to participate and engage in sex offender treatment or his adult portion of his sentence would be imposed. Despite this order, ODYS sat on its hands until March 31, 2017, when the juvenile court discovered ODYS had not immediately placed A.W. into sex offender treatment or notified the court of its inability to place him into treatment. A.W. was advised on March 31, 2017, that if he participated in sex offender treatment, the adult portion of his sentence would not be invoked. The court's journal entry noted that A.W. would turn 21 on May 23, 2017, and that he needed "to complete as much of the program as he can." And the court promised A.W. that "if you do everything you're supposed to, I will not impose your SYO." (March 31, 2017 tr. 10.) The record reflects that A.W. did everything he was supposed to do from March 31, 2017, yet the juvenile court still invoked the SYO. It can only be deduced from the record that its justification for doing so was because of statements made during A.W.'s full participation in treatment - incriminating statements that violated his Fifth Amendment right. The system obviously failed A.W. by depriving him of basic fundamental fairness.
 

 {¶ 117} For the foregoing reasons, I would vacate the juvenile court's order invoking the adult portion of A.W.'s SYO sentence.
 

 On April 2, 2018, D.J. appealed this decision to the Ohio Supreme Court.
 
 See In re D.J.
 
 , 2018-0479. The jurisdictional memorandum is pending.